23798

In the Matter of Robert A. DOBSON, III, Respondent.

(427 S.E. (2d) 166)

Supreme Court

*Attorney Gen. T. Travis Medlock, Deputy Atty. Gen. William K. Moore,* and *Asst. Atty. Gen. James G. Bogle,* Columbia, *for complainant.*

*Harold W. Jacobs* of *Nexsen Pruet Jacobs & Pollard,* Columbia, and *Edward E. Saleeby, Sr.,* of *Saleeby & Cox,* Hartsville, *for respondent.*

Heard Nov. 16, 1992; Decided Feb. 1, 1993.

Reh. Den. March 15, 1993.

*Per Curiam:*

This is a disciplinary proceeding in which respondent Robert A. Dobson, III is alleged to have participated in a scheme to evade securities laws during the 1970s.[1] We find the facts to be as follows.

Respondent entered the practice of law after attaining competency as a certified public accountant. Respondent's clientele included wealthy individuals who wished to take advantage of tax shelters and other investment opportunities. In August 1972, one of respondent's clients introduced respondent to Butch Foster, a broker for Premier Corporation (Premier). Premier owned cattle herds which it offered to sell for investment purposes. The investment schemes proposed by Premier were structured to allow income to be moved from one taxable year to the next, or sheltered in investments which required a cash down payment and payment on a note over a period of years. In exchange, the investor received the depreciation deduction, investment tax credits, and other benefits. It was contemplated that the investor's cattle herd eventually would be liquidated and the resulting income taxed at a capital gains rate at the end of the investment period.

Foster operated through a Georgia corporation called Financial Analysts, Inc. (FAI). Shortly after respondent met Foster, he agreed to provide legal representation to Foster and FAI. Respondent thereafter prepared the proper documentation required in order for FAI to do business in South Carolina.

On June 29, 1973, Premier made a private securities offering in South Carolina for the sale of cattle breeding herds. The offering was registered under the Securities Exchange Commission (SEC) and expired on March 29, 1974. Thus, under applicable securities regulations, Premier had to sell all the cattle it offered within nine months or it would be required to make a new offering. Foster, through FAI, commenced selling cattle herds to a number of respondent's clients in South Carolina.

When Premier's prospectus expired in March 1974, Premier still owned approximately 1555 head of cattle valued at over

---

[1] The alleged misconduct took place prior to this Court's adoption of the Rules of Professional Conduct in 1990. *See* Rule 407, SCACR. Accordingly, Rule 32, Sup. Ct. Rules, applies.

$2 million. Rather than making a new offering, Premier portioned out the 1555 head to Foster, individually, and to two sham entities. These three conveyances were merely paper transactions in which no money or other valuable consideration passed from Foster or the sham entities to Premier in exchange for the cattle.

In April 1974, Foster enlisted respondent's aid in furthering Premier's scheme by requesting respondent to sign a number of documents in blank as attorney for one of the sham entities, Southern Professionals. The documents included a note, representation statement, management contract, security agreement, purchase agreement, and numerous assignment forms. Those documents ostensibly conveying cattle from Premier to Southern Professionals were backdated to January 1974 to give the appearance that a bona fide transaction had taken place prior to the expiration of the prospectus. The assignments then were utilized by Foster to sell cattle to third parties; however, because Premier remained true owner of the herds, the sales amounted to illegal conveyances under a stale prospectus. It is unclear whether respondent knew at the time he executed the blank documents the purpose for which Southern Professionals was created.

According to respondent, he thought no more about the blank documents until May 1975, when he received a call from one of his clients. The client requested information from respondent about a herd of cattle that the client had purchased from Southern Professionals. When respondent disavowed any knowledge of the transaction, the client inquired as to the reason for respondent's name on the documents. At respondent's request, the client forwarded respondent copies of the Southern Professionals documents in his possession. Respondent claims he then contacted Foster, who assured him that Premier had made a paperwork error.

In March 1976, an attorney in Charleston called respondent regarding a cattle herd that one of the attorney's clients had purchased from Southern Professionals. The investment had gone sour, and the attorney desired to bring suit against Premier for breach of contract. Respondent again disclaimed preparing or signing any documents pertaining to Southern Professionals. The attorney confronted respondent with copies of numerous documents executed by respondent as at-

torney for Southern Professionals. Respondent subsequently agreed to aid the attorney in his suit against Premier. In October 1976, when the matter came to trial, respondent testified that "[Foster] said the reason for selling cattle to Southern Professionals was that Premier needed on their books to show that the cattle was sold."

Respondent's own business dealings with Foster also indicate that he knew or should have known of Premier's scheme. Respondent offered to purchase 85 head of Foster's individual herd in October 1974 at terms more favorable than those offered to the public. As part of the deal, Foster signed a $35,000 note by which he evidently indemnified respondent for respondent's first year expenses in relation to the herd. Significantly, respondent asked Foster for verification that Premier had accepted the terms of the transaction. Foster gave respondent a copy of a hand written authorization signed by one of Premier's principals in which Foster was given the ability to sell cattle herds at preferred terms to those "advisors" Foster utilized to help him dispense with his individual herd. Disturbed by the inferences of this letter, respondent withdrew his offer to purchase by sending a letter to Premier in which he stated that his "need for a tax shelter [was] not as great as originally anticipated."

By the mid-1970s, Premier's investment scheme began to collapse. Respondent's involvement with Premier and his representation of Foster eventually conflicted with his representation of another client, Pepsi-Cola Bottling Co. (Pepsi).

Pepsi had invested $600,000 in a 400-head Premier herd in October 1973 after obtaining reassurance from respondent that the shelter was sound. Later, Pepsi purchased a second herd from the cattle conveyed to Foster, individually, for $600,000, for a combined investment in Premier cattle of $1.2 million. The second sale was consummated in August 1974, some five months after the expiration of Premier's prospectus.

In 1976, Pepsi retained respondent's law firm to commence litigation in federal court against Premier and a number of its principals for violation of securities laws.[2] Respondent accepted the employment without making disclosure to Pepsi of his

---

[2] *Pepsi-Cola Bottling Co. v. Premier Corp.*, filed in the United States District Court for the District of South Carolina, Florence Division, on December 30, 1976 (the Pepsi litigation).

knowledge of Premier's actions or the fact that he potentially could be a witness in the lawsuit. He also failed to disclose that he represented Foster and FAI, whom he knew or should have known were involved in the Premier fraud; that he had helped create Southern Professionals, thereby furthering the fraud; or that he had business dealings with Premier and Foster that could adversely impact his representation of Pepsi.

The Pepsi litigation moved very slowly. Pepsi became frustrated with the lack of progress of the litigation, and requested that respondent associate a litigation firm to pursue the action against Premier. Respondent associated Ronald E. Boston of Tur-rner, Padget, Graham and Laney, who in turn associated John P. Freeman, a professor at the University of South Carolina law school proficient in securities law. These attorneys became involved in the discovery process, and, as a result, the facts surrounding respondent's involvement with Premier and Foster began to emerge. A confrontation between respondent, Freeman, Boston, and representatives of Pepsi took place on August 19, 1980, at which time respondent denied any wrongdoing. Pepsi discharged respondent as its attorney and amended its complaint against Premier to include respondent and his law firm as defendants and participants in the fraud perpetrated by Premier.[3] The litigation eventually was settled.

Respondent's alleged misconduct was brought to the attention of this Court after respondent applied to the Tax Advisory Board for certification as a tax specialist in 1984. In response to the Tax Advisory Board's routine inquiry regarding prior litigation to which respondent was a party, respondent misrepresented the reason he was named as a defendant in the Pepsi litigation. The Tax Advisory Board denied respondent's application for certification on ethical grounds.

Thereafter, a complaint was filed with the Board of Commissioners on Grievances and Discipline (Board). The matter came before a Panel of the Board for four days of testimony in 1990. The Panel recommended that respondent receive a public reprimand. The Executive Committee unanimously recommended disbarment.

---

[3] *Pepsi-Cola Bottling Co. v. LeBlanc,* filed on August 28, 1980.

We find that respondent engaged in affirmative acts of ■ misconduct to the detriment of his clients and the legal profession. We also find that respondent deliberately evaded knowledge of facts which tended to implicate him in a fraudulent scheme.[4] This Court will not countenance the conscious avoidance of one's ethical duties as an attorney. *In re Solomon,* — S.C. —, 413 S.E. (2d) 808 (1992). In addition, we find that respondent submitted false and misleading information to the Tax Advisory Board and the Panel of the Board of Commissioners on Grievances and Discipline, each of which acts as an arm of this Court. Accordingly, we find that respondent has violated Rule 32, Sup. Ct. Rules, in the following particulars:

DR 1-102(A)(1) (prohibits a lawyer from violating a Disciplinary Rule)

DR 1-102(A)(4) (prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation)

DR 1-102(A)(6) (prohibits a lawyer from engaging in conduct that adversely reflects upon his fitness to practice law)

DR 5-101(A) (prohibits a lawyer from accepting employment if the exercise of his professional judgment in behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests, except with the consent of his client after full disclosure)

DR 5-101(B) (prohibits a lawyer from accepting employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness)

DR 5-105(A) (prohibits a lawyer from accepting proffered

---

[4] At respondent's deposition taken during the Pepsi litigation, respondent was questioned regarding the note he signed as attorney on behalf or Southern Professionals. His responses are revealing:

Q: Do you know the amount of the note?
A: No.
Q: Did you try to find out?
A. No.
Q: How can you make full disclosure if you didn't know?A: I have given full disclosure of what I know.

employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment)

DR 5-105(B) (prohibits a lawyer from representing multiple clients if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client)

Although the recommendations of the Panel and the Board are persuasive, the ultimate authority to discipline attorneys and the manner of discipline rests with this Court. *In re Gregory,* — S.C. —, 411 S.E. (2d) 430 (1991). In view of the fact that the passage of time has made it extremely difficult for the State to prosecute this action, and equally difficult for respondent to defend himself, we conclude that the appropriate sanction is a definite suspension for two years.

Definite suspension for two years.