510 S.E.2d 718

**In the Matter of Eric P. NELSON, Respondent.**

No. 24883.

Supreme Court of South Carolina.

Heard Oct. 20, 1998.
Decided Jan. 18, 1999.
Rehearing Denied Feb. 23, 1999.

Eric P. Nelson, of Myrtle Beach, Pro Se Respondent.

Assistant Deputy Attorney General J. Emory Smith, Jr., of Columbia, for the Office of Disciplinary Counsel.

PER CURIAM:

In this attorney discipline matter, the Respondent Eric P. Nelson ("Attorney") is alleged to have committed misconduct by making improper sexual advances toward employees, co-workers, a potential client, and the relative of a client. Attorney was also alleged to have violated the Rules of Professional Conduct in regard to several alcohol related matters. In June of 1996, the Board of Commissioners on Grievances and Discipline petitioned this Court to have Attorney suspended from the practice of law or, in the alternative, placed on incapacity inactive status [1] in light of Attorney's admitted alcohol addiction. With Attorney's consent, the Court placed him on incapacity inactive status, while stipulating that disciplinary proceedings would go forward against him. Throughout the process, Attorney's defense has been a mixture of denial of the allegations combined with attributing any miscon-

---

1. Incapacity inactive status was known as "disability inactive status" before the new Rules for Lawyer Disciplinary Enforcement were adopted.

duct that did occur to his alcohol addiction and his doctor's treatment of this condition.

In the disciplinary proceedings, the Panel found that "there is an abundance of evidence which shows [Attorney] went through a period of time in his life and practice where his conduct was impaired." The Panel also found a "pattern of disturbing behavior [Attorney] exhibited while intoxicated." The Panel concluded that Attorney "had a serious behavior problem brought about by his abuse of alcohol" and "[t]here is no question that [Attorney] has committed misconduct." The Panel recommended that Attorney receive a public reprimand and have limitations placed upon him pursuant to Rule 7(b)(10) of the Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR which would require Attorney to continue to participate in recovery programs for his alcohol addiction.

After hearing the arguments of counsel, reviewing the complete record in this matter, and considering the applicable law and precedent, we find that Attorney's misconduct requires a definite suspension from the practice of law for nine months commencing after he is removed from incapacity inactive status.[2]

## FACTS

### 1. IMPROPER SEXUAL ADVANCES TOWARD CLIENT'S NIECE

Attorney represented a client ("Client") in a family court matter. Attorney scheduled Client's niece ("Niece") to testify on her uncle's behalf. Along with her sisters, Niece met Attorney at his hotel in Charleston one night to prepare for her testimony the following day. Niece and her sisters alleged that Attorney smelled of alcohol and used vulgar and profane language when they met in the mezzanine. Attorney then requested that Niece accompany him alone to his hotel room so they could prepare her testimony.

---

**2.** Attorney has pending before this Court a petition for removal from incapacity inactive status. This Court has held action on this petition in abeyance pending an independent evaluation to determine whether Attorney continues to suffer from major depression, alcohol dependence, and sexual aggression. Attorney's request for reinstatement to active status will be considered after this Court receives the results of the evaluating psychiatrist.

Once alone in the hotel room, instead of preparing her testimony, Attorney began pestering Niece about her relationship with her husband. She testified that he belittled her religious beliefs and humiliated her. When the bartender from the mezzanine level visited the room, Niece used this opportunity to ask the bartender to have her sisters call her. When Niece's sisters called, Attorney told them he and Niece were naked and then he started making obscene sexual noises. Niece took the phone from Attorney and asked her sisters to come get her. When her sisters knocked on the door, Attorney again made obscene sexual noises. Niece then left the hotel. Except for a parting hug, the parties agreed Attorney never physically touched Niece.

Attorney and Client ultimately prevailed in the family court matter. After the trial was over, Client's family and Attorney went out to eat and, in front of her entire family, Attorney asked Niece out on a date that she refused. Later that night, Attorney called the family's hotel room while Niece was out shopping. Attorney talked to Niece's sister and told her that he was in love with Niece and would "have" her one day and that they would soon be married.

### 2. IMPROPER SEXUAL ADVANCES TOWARD T.F.

Attorney employed T.F. as an associate attorney from 1993 until 1995. She testified about an instance in which Attorney made improper sexual advances toward her. She and Attorney were working on a case in Columbia and staying in a hotel overnight. Although they had separate rooms. Attorney asked her to come by his room after dinner to discuss business. After discussing billable hours and goals, T.F. testified Attorney offered her alcohol and told her that he hired her because of her looks and that he wanted a relationship with her. She testified that she rebuffed his advances and there was no physical touching involved. After this trip, T.F. testified that Attorney treated her very differently and was often angry with her for no apparent reason.

### 3. IMPROPER CONDUCT INVOLVING M.W. AND HER INFANT SON

M.W. was an associate attorney who worked for Attorney from August 1995 until February 1996. M.W. had discussed

the possibility of getting a divorce from her husband with Attorney. M.W. testified before the Panel that Attorney made sexual advances toward her and tried to get her to leave her husband. She admitted that Attorney never touched her. The main incident in question occurred while M.W.'s infant son was hospitalized in Charleston. Attorney called M.W. late at night and told her that he had gained access to an intensive care unit treating her infant. She testified that he berated her and her husband for not, as he saw it, properly caring for the child. M.W. testified that Attorney told her that he gained entrance to this restricted area of the hospital with a gun. No criminal charges arising from the hospital incident appear in the Record or Report.

### 4. IMPROPER SEXUAL ADVANCES TOWARD R.C.

R.C. worked as an associate for Attorney in 1994. She testified that one night while working late, Attorney came into her office, offered her a beer, and initiated a very personal conversation. He questioned her about her personal life and offered to father a child for her because at the time she was not in a steady relationship. She rebuffed his advances and tried to leave the office. Before she left, she testified Attorney had an emotional breakdown and started to cry. R.C. stated that she felt he may have been suicidal but that she feared more for her own safety so she left the office. As a result of Attorney's behavior directed at her, R.C. testified she changed her manner of dress and developed a more negative attitude toward life.

### 5. IMPROPER SEXUAL ADVANCES TOWARD POTENTIAL CLIENT

Potential Client was an employee of the Lowe's paint department in 1993. She met Attorney when he bought some paint from her. Potential Client found out that he was a lawyer and told him she had legal problems concerning the custody of her children. She later visited his office concerning these custody matters. She testified that while she was at Attorney's office, he was drinking and made aggressive and improper sexual advances. These advances included uninvited physical touching by Attorney. Attorney also told her he was "the most powerful attorney in all of Myrtle Beach." She rebuffed his advances and left the office. Attorney, upset by

her rejection, followed behind her calling her names such as "trailer trash."

After her visit, Potential Client took out an arrest warrant on Attorney, but later dropped the charge after court personnel convinced her that it would not be successful. She also accepted an $800.00 check from Attorney as a settlement in the matter, but never signed the release papers.

## 6. IMPROPER SEXUAL RELATIONSHIP WITH RECEPTIONIST

The allegations concerning an improper and coerced sexual relationship between Attorney and his receptionist were some of the most serious leveled against Attorney. She has since moved out of the state and did not appear in front of the Panel to testify as to her experiences with Attorney. As a result, the Panel concluded that they had no credible evidence to find specific wrongdoings against Attorney in this matter. There is, however, evidence in the Record revealing Attorney behaved improperly in relation to this employee. Testimony by R.C. relates that the receptionist called her up late at night crying and upset because Attorney was beating on the door of her home demanding to be let in. The affidavits and testimony of T.F. and R.C., both who were employed as associate attorneys while the receptionist worked for Attorney, supported the receptionist's initial allegations of an improper sexual relationship. There was also testimony that R.C. and T.F. finally decided to leave Attorney's firm after discussions with the receptionist.

## 7. THE BOAT INCIDENT

Perhaps the most disturbing of the allegations leveled against Attorney came from a young woman ("M.A.") and the Coast Guard. Like the receptionist, M.A. failed to appear and testify at Attorney's Panel Hearing. For this reason, the Panel did not consider any of the allegations in their report. There is, however, plenty of material in the Record to gain an understanding of the events that occurred between M.A., Attorney, and the Coast Guard. Attorney denied all wrongdoing in this matter.

On September 27, 1995, M.A. went on a boat trip with Attorney off Myrtle Beach. They were gone most of the day

and the evening together. Late that night, the Coast Guard received a call from M.A.'s mother. She told them that her daughter was stuck on a boat offshore and needed to be brought home. The Coast Guard found Attorney's boat stuck in the Little River and removed M.A. from the boat at her request. The Coast Guard returned to the boat and tried to board it to check on Attorney. Their efforts were stalled for more than an hour as Attorney's dog kept the Coast Guard members at bay. After they finally boarded the ship, the Coast Guard found Attorney unconscious with a loaded shotgun on board the boat. After removing her from the boat, the Coast Guard reported that M.A. was very upset and scared of Attorney.

As mentioned above, M.A. did not testify about the alleged sexual advances Attorney made during the time he had her on his boat. The Coast Guard's incident report and other materials that are part of the Record contain her version of the events. Particularly disturbing is the Coast Guard's incident report and testimony before the Panel describing Attorney's actions that night on the boat. The incident report notes that Attorney advised the Coast Guard members that he was a lawyer and had a friend in Congress that they would be hearing from as a result of their actions. Furthermore, in the follow up interview concerning the incident, Detective Tommy Flowers noted in his report that during the interview, Attorney was very arrogant and began the interview by arguing with the detective over jurisdictional matters. As noted above, since M.A. did not testify, the Panel did not consider these allegations in its final report and recommendation.

## SANCTION

The authority to discipline attorneys and the manner in which the discipline is given rests entirely with this Court. *In re Wofford,* 330 S.C. 522, 500 S.E.2d 486, 489 (1998). Furthermore, in attorney disciplinary proceedings, this Court may make its own findings of fact and conclusions of law. *In re Marshall,* 331 S.C. 514, 498 S.E.2d 869 (1998). We find, by the various instances of misconduct reviewed by the Panel, Attorney has engaged in conduct tending to bring the court or legal profession into disrepute. Also, Attorney engaged in conduct involving moral turpitude. By his actions, respondent

violated Rules 8.4(a) and (e) of the Rules of Professional Conduct contained in Rule 407, SCACR, and Rule (7)(a)(5) of the Rules for Lawyer Disciplinary Enforcement contained in Rule 413, SCACR.

We have duly considered Attorney's admitted alcoholism in determining the appropriate sanction. *See In re Brooks,* 324 S.C. 105, 477 S.E.2d 98 (1996) (finding that alcoholism may be considered in determining appropriate sanction for attorney misconduct.); *In re Perry,* 291 S.C. 124, 352 S.E.2d 479 (1987) (same). Further, this Court agrees with the Panel that alcohol contributed greatly to Attorney's troubles in this case. However, alcohol and depression do not excuse attorney misconduct. *Brooks,* 324 S.C. at 105, 477 S.E.2d at 98; *In re Fullwood,* 322 S.C. 1, 6, 471 S.E.2d 151, 154 (1996). Prior to the completion of this case, Attorney has sought treatment for his alcohol addiction and his progress appears promising. This Court is concerned, however, by the Record's insufficient amount of information concerning the diagnosis or treatment of Attorney's sexual aggression towards women. The Panel concluded that any sexual aggressive conduct resulted from the alcoholism and intoxication. Although entitled to great deference, the Panel's findings in this matter are not binding upon this Court. *In re Dobson,* 310 S.C. 422, 427 S.E.2d 166 (1993).

The primary purpose of disbarment or suspension is the removal of an unfit person from the profession for the protection of the courts and the public, not punishment of the offending attorney. *Brooks,* 324 S.C. at 105, 477 S.E.2d at 99. The purpose of the examination of Attorney directed in connection with his petition for removal from incapacity inactive status is to get an objective evaluation of Attorney's current status and need for additional treatment. Once Attorney is removed from incapacity inactive status, his nine month suspension shall commence.

**DEFINITE SUSPENSION.**