600 S.E.2d 902

**In the Matter of Ray D. LATHAN, Respondent.**

**No. 25842.**

Supreme Court of South Carolina.

Submitted June 10, 2004.

Decided July 20, 2004.

Order Reinstating Respondent July 27, 2004.

Henry B. Richardson, Jr., of Columbia, for the Office of Disciplinary Counsel.

Elizabeth Van Doren Gray, of Sowell, Gray, Stepp & Laffitte, L.L.C., of Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the agreement, respondent admits misconduct and consents to a definite suspension from the practice of law for a period of not less than four nor more than twelve months. We accept the agreement and definitely

suspend respondent from the practice of law in this state for a six month period, retroactive to his interim suspension. The facts, as set forth in the agreement, are as follows.

## FACTS

Respondent was admitted to practice law in South Carolina on September 1, 1970. He is a partner in the law firm of Lathan and Barbare (Firm) with his partner Ronald F. Barbare (Partner). Respondent and partner are the only two attorneys employed by the Firm.

The Firm's primary practice is the closing of real estate transactions. The Firm handles approximately 1400 to 1600 real estate closings per year.

On or about November 19, 2003, respondent and his partner pled guilty before the United States District Court for the District of South Carolina to one count of violation 18 U.S.C. § 1010, a felony. The information to which respondent pled guilty provided that he falsely certified that he had received cash from borrowers in amounts reported on HUD–1 Settlement Statements he prepared and submitted to the United States Department of Housing and Urban Development when respondent did not receive the cash.

Because of cooperation with federal authorities into matters related to the information and to other investigations, the United States Attorney made a motion for downward departure. Both respondent and his partner received favorable recommendations in the pre-sentencing report submitted by the United States Probation Department. Both respondent and his partner were sentenced to pay a fine of $5,000 as final disposition of their pleas; both have paid those fines.

### Firm's General Procedure for Closing Real Estate Transactions

The Firm's paralegal was the principal point of contact between the Firm and the seller. The paralegal reviewed the lender's instructions and the contract of sale and prepared closing documents and a balance sheet showing incoming funds and disbursements. Changes to the transaction were conveyed by the seller to the paralegal who would then make

pen and ink changes on the Firm's in-house balance sheet reflecting the changes directed by the seller.

Another Firm employee then prepared checks for disbursement in accordance with the balance sheet, including any pen and ink changes prepared by the paralegal. Thereafter, the paralegal prepared a class report showing the disbursements made out of the Firm's trust account in connection with each transaction.

Respondent or his partner reviewed the various closing documents, attended the closing with the seller and borrower, and gave instructions to the Firm staff for the conclusion of transactions. Respondent or his partner attended and supervised all closings.

Generally, there were no direct communications between the Firm and the borrowers prior to closing. In general, neither respondent nor his partner had any communications with the seller concerning an individual transaction prior to closing.

### Cromer Company Transactions

Respondent and his partner served as closing attorneys in a number of real estate transactions where the Cromer Company was the seller of mobile home and land packages. The principal owner of the Cromer Company was A. Eugene Cromer (Cromer). Melissa Caldwell (Caldwell) was an employee of the Cromer Company and was often the principal point of contact between the Cromer Company and the Firm.

On one occasion, respondent closed loans for the Cromer Company where the HUD–1 Settlement Statement reflected that certain sums of money on line 303 "cash from borrower" had been paid by borrowers at closing when the balance sheet (in-house schedule of incoming funds and disbursements) and the Firm's class report (trust account ledger) showed no money had been received into the Firm's trust account. On this occasion, no money was received by the Firm from borrowers.

Respondent represents that Cromer or a representative of his company advised the Firm staff, probably to the paralegal, that this amount had been paid by borrowers directly to the

Cromer Company. Thereafter, the paralegal made pen and ink changes to the balance sheet to reflect that no "cash from borrowers" was received at closing and reduced the "cash to seller" on line 603 of the HUD–1 statement by the amount of the "cash from borrower" shown on line 303.[1] However, the HUD–1 form submitted to the lenders were not amended and continued to show an amount of "cash from borrower" on line 303 and no notation of "POC" (a standard abbreviation for "paid outside of closing"). The HUD–1 form contained the standard statement signed by respondent to the effect "the HUD–1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement."

On another occasion, respondent served as the closing attorney for a transaction between the Cromer Company as seller and Ms. Z as buyer. On line 303, the HUD–1 statement showed "cash from borrower" to be $5,211.50. However, on instructions from the seller, pen and ink changes were made to the balance sheet, deleting the amount of "cash from borrower" on line 303 and reducing "cash to seller" on line 603 by a like amount. No corresponding change was made to the HUD–1 form which was sent to the lender and no "POC" notation was made on line 303. The Firm's class report did not show "cash from borrower" deposited into the Firm's trust account and, instead, showed the amount of the "cash to seller" reduced by the amount the HUD–1 form showed as "cash to borrower." This caused a variance in the information given the lender in the HUD–1 form and the actual disbursements from the Firm's trust account. The HUD–1 form contained the standard attorney certification as set forth above.

On two other occasions, respondent closed transactions wherein the Firm's class report showed the line 303 "cash from borrower" was paid at closing by a check drawn on the Cromer Company account rather than by cash or a check from the borrowers. This fact was not disclosed to the lender. Respondent represents that a representative of the Cromer Company told a Firm employee that the "cash from borrow-

---

1. In the lending business, this technique is referred to as "shorting the seller."

ers" in these two transactions had been paid directly by borrowers to the Cromer Company.

Respondent is now informed and believes that the representations from the Cromer Company that the amount "due from borrower" on these last three occasions had been paid directly by borrowers to the Cromer Company were false, that there was (at least in most instances) no money paid from the borrowers as represented on line 303 of the HUD–1 form and that Cromer's misrepresentations were in furtherance of his scheme to sell mobile home and land packages to borrowers without the borrowers having to contribute any money to the transactions. As a result, it now appears that the representations made by respondent concerning the information on lines 303 and 603 of the HUD–1 statements were incorrect. The inaccurate report had the tendency to cause lenders to believe that borrowers had invested money in the transactions when, in fact, the borrowers had not, and caused the price of the package to be inflated by the amounts shown on line 303 of the HUD–1 form.

Cromer and Caldwell were indicted in the United States District Court in connection with one or more transactions closed by the Firm where the Cromer Company was the seller. An allegation in Cromer's indictment states Cromer made false statements concerning down payments (information on line 202 of HUD–1 forms) and "cash from borrowers" (information on line 303 of HUD–1 forms). Cromer pled guilty to one count of mail and wire fraud in connection with these transactions and was sentenced to eighteen months in prison. In his plea agreement, Cromer admitted he had derived between $5,000,000 and $10,000,000 in benefits from his scheme.

ODC does not contend that either respondent or his partner were aware of Cromer and Caldwell's criminal activities or of the amount of the money involved. Instead, ODC contends respondent's failure to either amend line 303 and line 603 to reflect "no cash from borrower" received by the Firm or to place the notation "POC" by the line 303 data made it possible for Cromer to engage in the criminal activity stated in the Cromer indictment.

In approximately twelve transactions in which the Cromer Company was the seller and the Firm served as closing agent, borrowers made claims or, in some cases, initiated litigation, against the Firm. The Firm and/or respondent and his partner and their insurance carrier paid $2,500 per case to settle the claims.

## Stegall Entities Transactions

For many years, the Firm handled numerous real estate transactions for several entities owned and managed by Donald L. Stegall (Stegall). Respondent served as closing attorney in approximately fourteen transactions where Stegall entities were the sellers of mobile home and land packages.

In each of these fourteen transactions, the HUD–1 statements and Firm balance sheets were prepared by the Firm's paralegal based on information from contracts of sale, information in the lender's loan closing instructions, and/or instructions from Stegall employees, usually Teresa Ashmore (Ashmore). In each of the transactions, both line 303 on the HUD–1 statement and the balance sheet would initially reflect amounts of money to be paid by the borrower at closing. Prior to closing, Ashmore would instruct the paralegal to make changes, primarily reducing the amount of "cash from borrower" to zero and making corresponding reductions in "cash to seller" on line 603 and, in other cases, directing other changes in disbursements to Stegall entities to cause the disbursements to balance.

The changes made by the paralegal at Ashmore's directions were not reflected on the HUD–1 forms which were sent to the lenders. In each of these transactions, the HUD–1 statement contained a certification signed by respondent, as settlement agent, to the effect "the HUD–1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement." None of the fourteen settlement statements contained the notation "POC" beside line 303 "cash from borrower" even though this amount was not received by the Firm. Accordingly, there was a variance in the information furnished to the lenders on the HUD–1 statements and the actual disbursements made out of the Firm's

trust account in connections with these transactions. Accordingly, there was a variance in the information furnished to the lenders on the HUD–1 statements and the actual disbursements made out of the Firm's trust account in connection with these transactions.

In six of the Stegall closings, addendums to the HUD–1 statements were prepared by the Firm's staff and executed by the parties. The effect of the addendums was to reduce to writing the changes which had been directed by Stegall employees, usually Ashmore, and made to the balance sheet by the paralegal. The addendums were not sent to the lenders.

In one Stegall transaction, respondent closed loans for Borrowers Y and Z. Because the transaction was insured by the Federal Housing Administration (FHA), an FHA Addendum was required. The borrowers and seller signed certifications on the FHA Addendum prepared by respondent stating that there had not been any reimbursement for cash down payments or closing costs not disclosed to the lender. Respondent signed the certification on the FHA required addendum that the HUD was "... a true and accurate account of the funds that were (i) received or (ii) paid outside of closing, and the funds received have been or will be disbursed by [respondent] as part of the settlement of this transaction."

The HUD–1 statement sent by respondent to the lender also contained the standard certification signed by respondent as the settlement agent. The HUD–1 statement sent to the lender showed $2,987.86 "cash from borrower," however no cash from the borrowers was received by respondent or the Firm in connection with the transaction and the amount actually paid to the seller was reduced by the amount "due from borrower." As a result, there was a variance in the information furnished the lender on the HUD–1 statement and the FHA required addendum and the actual disbursements made from the Firm's trust account and this, in turn, caused respondent's certifications to be incorrect. Similar transactions occurred in other FHA insured loans closed by respondent where a Stegall entity was the seller.

Many of the transactions handled by the Firm for the Stegall entities were funded by Cendant Mortgage Corporation (Cendant). Jeffrey L. Greene (Greene) was Cendant's

local representative and was the usual point of contact between the Firm and Cendant. Respondent was aware that Greene was also the principal point of contact between the Stegall entities and Cendant. Respondent knew Greene approved financing for borrowers of mobile home and land package sales made by Stegall entities.

On or about June 4, 2001, respondent closed a transaction where Greene was the borrower.[2] The transaction was not financed by Cendant. The transaction was modified, not only to cause Greene to be forgiven of "cash from borrower" as shown on line 303 of the HUD–1 statement in the amount of $18,147.43, but also to cause Greene to leave the transaction with a check drawn on the Firm's trust account as a "refund" in the amount of $3,000. This change was directed by a Stegall representative to the Firm's paralegal. The paralegal made pen and ink notations on the balance sheet to reflect these changes. An addendum to the HUD–1 statement was prepared to reflect these changes and was presented by respondent to the parties for their signatures at closing. The HUD–1 statement sent to the lender does not mention a "refund" to Greene and does not reflect the $18,147.83 "gift" from a Stegall entity to Greene negating the "cash from borrower" information on line 303. The addendum was not furnished to the lender.

In another transaction,[3] the HUD–1 statement sent to the lender shows "cash from borrower" in the amount of $2,038.12. There is no indication of a corresponding deposit in the Firm's trust account. The HUD–1 statement sent to the lender reflects a $43,750 deposit, but there is no record of a deposit in that amount to the Firm's trust account.

In connection with this transaction, the Firm's trust account reveals the deposit of loan proceeds of $76,830.40 and deposit of a check "from buyer" (drawn on a BB & T account) in the amount of $37,500. Respondent knew the Stegall entities banked with BB & T. There is a disbursement from respondent's trust account to a Stegall entity in the exact amount of $37,500 and a refund to Stegall individually of $1,389.

---

2. This was one of the fourteen transactions mentioned above.

3. This was one of the fourteen transactions mentioned above.

Amounts due to the Stegall entity are reduced on the balance sheet to reflect the foregoing and to cause the balance sheet and the corresponding disbursements from the trust account to be in balance. The HUD-1 statement sent to the lender was not amended to correspond to the actual disbursements made out of the Firm's trust account at the direction and/or approval of respondent. The HUD-1 statement contains no mention of either the $37,500 (either coming into or going out of the Firm's trust account) or Stegall, individually, receiving a refund or even being involved in the transaction.

At some point, respondent became concerned whether borrowers were making the "cash from borrower" payments directly to the Stegall entities. According, respondent began requiring presentation of a cashier's check for the "cash for borrowers" at the closing. In approximately thirteen transactions, the cashier's checks were prepared by BB & T and delivered by Stegall employees to respondent's staff. Respondent is now informed and believes the Stegall entities furnished most, if not all, of the money to purchase the cashier's checks, but this was not known by respondent until it came to light during discovery in the Cendant case. *See infra.*

Greene was indicted. He pled guilty in the United States District Court to one count of wire fraud and was sentenced to five years probation and restitution in connection with fraudulent dealings with Stegall and Ashmore to the detriment of Cendant and other lenders who purchased loans with inflated property values. In his plea agreement, Greene admitted deriving between $1,500,000 and $2,500,000 from his scheme with Stegall and Ashmore.

With information available from criminal proceedings and related civil litigation after the closings, it now appears that the accommodations in the foregoing transactions by Stegall entities to Greene were in return for Greene inducing Cendant to make loans on inflated mobile home and/or land packages to borrowers who were buying from Stegall entities. Respondent was unaware of Stegall and Greene's arrangement concerning the Cendant loans.

Stegall and Ashmore were also indicted in the United States District Court in connection with defrauding lenders in conspiracy with Greene. Stegall pled guilty to one count of wire

fraud and was sentenced to eighteen months in prison. In his plea agreement, Stegall admitted deriving $3,075,000 from the real estate transactions related to his plea. One or more of the transactions mentioned in the information to which Stegall pled guilty were closed by the Firm.

As a result of the foregoing, Cendant initiated litigation against the Firm. Cendant was paid $750,000 as settlement on behalf of the Firm. Five hundred and seventy five thousand dollars of this amount was paid by the Firm's insurance carrier and the remainder was paid by the Firm or respondent and his partner.

## Additional Facts

ODC's investigation reveals respondent did not receive any special financial benefit from the closings investigated by ODC. All fees received are shown on the Firm's class report; the fees appear to be reasonable and customary for work of this type in Greenville.

ODC does not allege respondent deliberately sought to assist Cromer, Caldwell, Stegall, Ashmore, or Greene in criminal undertakings or had knowledge of their criminal intent. However, submitting HUD–1 Settlement Statements to lenders which were at variance with receipts and disbursements from the Firm's trust account enabled these people to break the law. With the advantage of hindsight and discovery of criminal activity, respondent now recognizes there were "red flags" which should have alerted him that the Cromer Company and the Stegall entities were seeking to mislead lenders, particularly in closing transactions where Stegall entities effectively gave money to Greene who was originating loans from Cendant to borrowers purchasing mobile home and land packages from Stegall entities.

It now appears that in many of the mobile home and land package transactions respondent closed for the Cromer Company and the Stegall entities, borrowers paid no money into the transactions. Instead, these sellers were seeking to close the transactions without the borrowers contributing their own money as an inducement for borrowers to close the transactions with their businesses. This information was not known to respondent until after the closing of all of these transac-

tions. Respondent represents that he was unaware of the Stegall entities' duplicity concerning the use of cashier's checks in thirteen closings.

## *LAW*

■ Respondent admits that by his misconduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to client); Rule 1.2(e) (when lawyer knows client expects assistance not permitted by the Rules of Professional Conduct or other law, lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct); Rule 4.1(a) (in the course of representing a client, lawyer shall not knowingly make a false statement of material fact or law to a third person); Rule 4.1(b) (in the course of representing a client, lawyer not fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6); Rule 5.1(a) (partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct); Rule 5.3(b) (with respect to a nonlawyer employee, lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with professional obligations of the lawyer); Rule 8.4(a) (lawyer shall not violate Rules of Professional Conduct); Rule 8.4(b) (lawyer shall not commit criminal act that reflects adversely on lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects); Rule 8.4(d) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation); and Rule 8.4(e) (lawyer shall not engage in conduct that is prejudicial to administration of justice). In addition, respondent admits his misconduct constitutes a violation of Rule 7, RLDE, of Rule 413, SCACR, specifically Rule 7(a)(1) (lawyer shall not violate Rules of Professional Conduct or any other rules of this jurisdiction regarding professional conduct of lawyers), Rule 7(a)(4) (lawyer shall not be convicted of crime of moral turpitude or serious crime); and Rule 7(a)(5) (lawyer shall not engage in conduct tending to pollute the administration of justice or to bring the courts or the legal

profession into disrepute or conduct demonstrating an unfitness to practice law).

## CONCLUSION

We accept the Agreement for Discipline by Consent and definitely suspend respondent from the practice of law for a six month period, retroactive to the date of his interim suspension. Within fifteen days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

The Court is troubled by the recent number of real estate transactions which have been the subject of misleading, fraudulent, and/or criminal schemes. Inaccurate HUD–1 Settlement Statements and other closing documents contribute to these deceptive activities. Respondent's misconduct derives principally from his inaccurate representations on HUD–1 Settlement Statements. These misrepresentations have subjected respondent to both federal criminal penalties and the current disciplinary action by this Court.

In addition to completing HUD–1 Settlement Statements, attorneys prepare their own settlement statements. These documents, too, must also correctly reflect the underlying financial transaction by the parties in order for the buyer, seller, and others to have an accurate record of the transaction.

According to the parties in this matter, a large number of attorneys are not passing closing funds through their trust accounts and, at the same time, not identifying the funds as paid outside of closing on closing documents. Not only does this practice fail to accurately record the actual transaction for the buyer and seller, but it is misleading to lenders. In an attempt to eliminate this and other deceptive practices, we emphasize that costs and credits in connection with a real estate transaction must be shown on the settlement statement and that the settlement statement must reflect all amounts paid, by whom paid, and to whom paid. Any charges or amounts paid outside of the closing must be reflected as such on the settlement statement (i.e., "POC"). For all funds exchanged during the closing, the attorney must have a record of the method of payment by the parties to the transaction, as

well as an accounting of all receipts and disbursements by the attorney. The attorney's records must accurately reflect the transaction as evidenced by the settlement statement unless there is written documentation signed by all parties to the transaction (including any lender) indicating that funds were disbursed otherwise. Failure to comply with these standards may subject attorneys to disciplinary action.

**DEFINITE SUSPENSION.**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.

## ORDER

Respondent was suspended on July 20, 2004, for a period of six months, retroactive to December 4, 2003. He has now filed an affidavit requesting reinstatement pursuant to Rule 32, of the Rules for Lawyer Disciplinary Enforcement contained in Rule 413, SCACR.

The request is granted and he is hereby reinstated to the practice of law in this state.

JEAN H. TOAL, CHIEF JUSTICE.

BY /s/ Daniel E. Shearouse
Clerk