654 S.E.2d 272

**In the Matter of T. Andrew JOHNSON, Respondent.**

**No. 26398.**

Supreme Court of South Carolina.

Submitted Nov. 6, 2007.

Decided Dec. 10, 2007.

Rehearing Denied Jan. 10, 2008.

500

Lesley M. Coggiola, Disciplinary Counsel, of Columbia, for Office of Disciplinary Counsel.

Daryl G. Hawkins, of Law Offices of Daryl G. Hawkins, LLC, of Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the agreement, respondent admits misconduct and consents to a definite suspension not to exceed one (1) year, retroactive to October 4, 2006, the date of his interim suspension.[1] We accept the agreement and definitely suspend respondent from the practice of law in this state for one (1) year, retroactive to October 4, 2006. The facts, as set forth in the agreement, are as follows.

## FACTS

■ In November 1998, respondent was admitted to the practice of law. At all times relevant to this agreement, he was a sole practitioner. In January 2004, respondent began to practice real estate law, primarily handling residential refinancings, and he closed roughly four to nine refinancing closings per month.

---

1. *See In the Matter of Johnson,* 370 S.C. 495, 636 S.E.2d 620 (2006).

In August 2004, Johnny Hoy contacted respondent and asked him to conduct real estate closings for individuals purchasing mobile home/real estate packages. As a real estate developer/investor Hoy would sell the mobile home property and arrange for financing for buyers with BB&T. Neither Hoy nor respondent knew each other or had business dealings before this initial contact.

Respondent had not previously closed mobile home transactions and had only limited experience in purchase transactions. Respondent informed Hoy, as well as the BB&T representative, Robert Green, the manager of a local branch, of his lack of experience in the area of mobile home purchase transactions. Respondent requested written closing instructions from BB&T and was told by both Green and Hoy that BB&T did not provide written closing instructions to closing lawyers and that, instead, BB&T relied upon their bank representatives to orally convey any applicable instructions. Respondent received direction regarding the lender's closing procedures from Green.

Respondent learned that a law firm in Columbia had previously represented Hoy in similar transactions. Hoy advised respondent that the law firm could no longer process the closings because of a disagreement with the firm's title insurance company.

Respondent contacted a lawyer at the law firm and asked questions about appropriate procedures in back to back closings, mobile home transactions, and this type of closing in general and why the law firm had ceased representing purchase(s)/mortgagee(s) in real estate closings arranged by Hoy. Respondent represents the lawyer told him that Hoy was "a straight shooter," or words of similar import and the law firm only ceased representing purchaser(s)/mortgagee(s) in transactions arranged by Hoy because the firm's title insurance company would not insure mobile home/real estate package transactions. The lawyer stated he hoped to assist Hoy in the future. The lawyer gave respondent no warning or information which would have raised concerns about Hoy, Green, or the procedures which had been presented.

In addition, respondent learned that another attorney had also closed loans for Hoy in an identical manner. Respondent

represents he attempted to contact this lawyer, but was unable to reach him.

During the first transaction involving Hoy and Green, respondent asked Hoy whether the buyer's closings funds would be paid by money order or cashier's check and Hoy informed respondent that he had already been paid. Respondent advised Hoy that advance payment of a down payment would require respondent to obtain approval from the lender and that he would inquire whether and how the advance payment would be reflected on the HUD–1 Settlement Statement.

Respondent communicated with Green who advised that the fact that Hoy had already been paid a down payment was acceptable procedure approved by the bank and that it was, in fact, a common occurrence. Green also advised respondent that, as a rule, the lender did not "source and season" either down payment funds or title, thereby diminishing the need for the closing attorney to verify funds or formalize disclosure. Further, Green advised that this procedure had been followed for a significant time by its two former closing attorneys, as well as an attorney in Aiken. Once again, respondent requested written closing instructions but was again told by Green that BB&T did not furnish written closing instructions.

At the first of the BB&T/Hoy closings, respondent presented the HUD–1 Settlement Statement to the buyer and seller and invited their attention to, among other things, the purchase price, the loan amount, and the down payment and asked if each was true and correct. Neither buyer nor seller indicated the amount was incorrect or that the down payment had not been paid. Respondent did not, however, devote any additional time or resources to the investigation of the acts surrounding the down payment in this matter and, instead, closed the loan as it was presented.

Thereafter, from August 12, 2004 through April 30, 2005, respondent served as closing attorney for purchaser(s)/mortgagee(s) in approximately 48 transactions arranged by Hoy, most, if not all, financed by BB&T with Green. Twenty-three of the transactions were "flips" where the subject property was purchased by Hoy and then conveyed to the actual/eventual purchaser(s)/mortgagee(s) in a second transaction at a value in excess of the real or initial acquisition costs by Hoy.

The HUD–1 Settlement Statements did not reflect the fact that the funds from the second transaction were used to fund Hoy's acquisition of the property in the first transaction.[2]

Respondent became concerned about the methods Hoy was using to consummate the transactions and discussed his concerns with Green. Among other perceived irregularities, respondent was concerned with 1) the back to back closings, title issues, de-titling issues, and valuation of the transactions wherein Hoy was acquiring the property then immediately (sometimes in the same day) conveying the property to a buyer; 2) the claimed down payment which both Hoy and the party purchasing the property from Hoy assured respondent had been paid; and 3) the possibility that some purchasers/mortgagees who qualified for loans did not intend to reside on the property and may have purchased properties for relatives who did not qualify for loans but intended to reside on the property.

Green advised respondent that the bank took no position on who resided on the purchaser's property. Further, Green, once again, told respondent that the methodology being used by Hoy was acceptable to the bank in all respects and that no other notification or documentation was necessary. Respondent faxed the Court's opinion in *Matter of Lathan*, 360 S.C. 326, 600 S.E.2d 902 (2004), to Green and insisted on complying with the requirement of placing the letters "POC" (payable outside of closing) on line 303 of all future HUD–1 Settlement Statements. Green indicated that, while respondent's request to comply with *Matter of Lathan* was "very conscientious" and "not necessary," it would be acceptable to the bank. Thereaf-

---

2. Specifically, the HUD–1 Settlement Statement did not show a concurrent transaction in which Hoy purchased the same property. In essence, there was a transaction between Hoy and the seller of foreclosed properties (usually the bank that had foreclosed on the property) and, concurrently, a transaction where Hoy was selling the same property to a third party buyer. While Hoy paid for his purchase with a business check drawn on his corporate account, respondent should have known that the short amount of time between Hoy's purchase and his sale enabled Hoy to use the same incoming funds from the second transaction to fund his purchase of the property in the first transaction. Respondent acknowledges that the HUD–1 Settlement Statement in the sales transaction by Hoy should have reflected that the funds from the sale were being applied to the initial acquisition by Hoy and the "due seller" line should have been reduced by a like amount.

ter, respondent closed an additional thirty-seven loans involving BB&T and Hoy. Unlike the loans in *Matter of Lathan*, the Hoy/BB&T loans were not sold on the secondary market but were retained and serviced by BB&T.

In a significant number of the transactions, the "cash from borrower" line on the HUD–1 Settlement Statements was marked "POC" when, in fact, the amounts were not actually paid outside of the closing to Hoy by the purchaser(s)/mortgagee(s). Respondent acknowledges that, under the circumstances of the closings, he should have known that this information reported to him by the buyers and Hoy was incorrect and he admits he eventually suspected this to be the case notwithstanding representations by the borrowers and/or Hoy.

In one matter, Hoy arranged two transactions where he was receiving title to a property in the first transaction and conveying the property in the second transaction. Hoy advised respondent that he had the subject property under contract with an out of state bank that was selling the property out of foreclosure, that the bank had allowed Hoy to take possession of the residence, that his contract to purchase had been in effect for roughly three months so that he could bring the residence up to a saleable state, and that he had made substantial repairs to the property's subfloor and replaced all of its appliances.

The two closings were both scheduled for December 12, 2004. On that day, respondent learned the selling bank had actually allowed Hoy to permit the eventual buyer to move into the property and the buyer had already taken up residence. The selling bank, however, waited until some time in January to mail the January 18th-dated deed to respondent. Respondent contacted the selling bank and attempted to obtain a properly dated deed which reflected the actual closing date of December 12, but the bank refused to do so.

Respondent brought this situation to the attention of the parties in the second transaction, the lending bank, the eventual buyer, and Hoy. The bank's loan officer indicated he would need to consult with his supervisor and, subsequently, advised respondent that the bank's position was that the loan on the transaction from Hoy to the bank's customer should be reclosed at a date after January 18 to correct any existing

deficiencies. Respondent inquired of the officer of the Register of Deeds regarding the process to ensure title was properly conveyed and was advised to record a corrective deed. The loan was then re-closed per the request of the bank and a corrective deed was recorded which reflected a deed transfer date subsequent to the transfer to Hoy on January 18th.

Ultimately, respondent learned that Hoy, Green, and the appraisers used by Hoy were subject to a federal investigation in connection with the real estate closings handled by respondent. Respondent made a self-report to ODC. Subsequently, another attorney who had also filed a civil lawsuit against respondent, Hoy, and Green, filed a complaint against respondent with the Commission on Lawyer Conduct.

Hoy and Green were indicted by federal authorities. Both pled guilty to bank fraud. An allegation in Hoy's indictment states Hoy was responsible for falsifying the loan applications of borrowers,[3] in addition to falsely reporting that he had received down payments. Federal authorities advised ODC that respondent cooperated fully in their investigation.

ODC does not contend respondent was aware of Hoy's or Green's criminal activities. Instead, ODC contends that respondent's failure to insist on certified funds from Hoy in his initial purchase of the properties was an unknowing and unintentional aid to Hoy and Green. Respondent's error was the result of failing to devote adequate time to the investigation of the facts surrounding the circumstances of the loans and, specifically, to the alleged down payments.

In mitigation, respondent attempted to contact two lawyers who had previously represented Hoy and did speak with one of the lawyers about representing Hoy. Further, respondent had multiple conversations with the bank's loan officer, Green, about the propriety of Hoy's transactions. However, respondent did not realize that Green was engaged in a conspiracy with Hoy.

ODC believes respondent did not deliberately seek to assist Hoy or Green or their co-conspirators in criminal undertakings or have knowledge of their criminal intent. Respondent

---

3. It is not claimed that respondent had any involvement in or suspicion of Hoy's false applications.

represents he saw no appraisals and had no contact with appraisers; ODC does not dispute this representation. Respondent's title search was conducted by an outside abstractor and the abstractor's fees were reasonable and customary in the area and properly reported on the HUD–1 Settlement Statements. ODC's investigation reveals respondent did not receive any additional financial compensation or other benefit from the closings involving Hoy and Green. All fees received by respondent are shown on the HUD–1 Settlement Statements and his law firm's trust account ledgers and the fees appear to be reasonable and customary for work of this type in the Columbia and Lexington areas of the state.

Respondent has no previous disciplinary history. He has been fully cooperative and forthright with ODC and the federal authorities in connection with their investigations. ODC submits respondent's forthrightness was demonstrated in his ready and candid admissions about his suspicions and concerns.

## LAW

■ Respondent admits that by his misconduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to client); Rule 1.2 (lawyer may limit objectives of representation with client consent after consultation); Rule 1.7(a) (lawyer shall not represent client if representation involves a concurrent conflict of interest); Rule 4.1(a) (in representing a client, lawyer shall not make false statement of material fact to a third person); Rule 4.1(b) (in representing a client, lawyer shall not fail to disclose a material fact when disclosure is necessary to avoid assisting criminal or fraudulent act by a client); Rule 8.4(a) (lawyer shall not violate Rules of Professional Conduct); Rule 8.4(d) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation); and Rule 8.4(e) (lawyer shall not engage in conduct that is prejudicial to administration of justice). In addition, respondent admits his misconduct constitutes grounds for discipline pursuant to Rule 7, RLDE, of Rule 413, SCACR, specifically Rule 7(a)(1) (it shall be ground for discipline for lawyer to violate Rules of Professional Conduct or any other rules of this jurisdiction regarding professional

conduct of lawyers) and Rule 7(a)(5) (it shall be ground for discipline for lawyer to engage in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law).

## CONCLUSION

We accept the Agreement for Discipline by Consent and definitely suspend respondent from the practice of law one (1) year, retroactive to October 4, 2006. Within fifteen days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

**DEFINITE SUSPENSION.**

TOAL, C.J., MOORE, WALLER and BEATTY, JJ., concur. PLEICONES, J., not participating.