636 S.E.2d 621

**In the Matter of Thomas B. HALL, Respondent.**

**No. 26212.**

Supreme Court of South Carolina.

Submitted Aug. 29, 2006.

Decided Oct. 9, 2006.

Henry B. Richardson, Jr., Disciplinary Counsel, and Michael J. Virzi, Assistant Disciplinary Counsel, both of Columbia, for Office of Disciplinary Counsel.

Desa Ballard, of West Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the Agreement, respondent admits misconduct and consents to a definite suspension from the practice of law not to exceed nine (9) months. We accept the Agreement and impose a nine (9) month suspension. The facts, as set forth in the Agreement, are as follows.

## *FACTS*

In 1999, respondent began practicing law in the area of real estate transactions. By the end of 2001, he was conducting approximately two hundred closings per month and employed five lawyers as full-time employees and many more as independent contracting attorneys. The Hall Law Firm was located in Columbia and the closings took place in Columbia and other areas of the state. Approximately eighty percent of respondent's closings were refinancings conducted at borrowers' residences.

In April 2002, respondent sold the assets of the Hall Law Firm to Nations Holding, a Kansas corporation. Nations Holding is not a law firm but is affiliated with the Kansas law firm Likens & Blomquist. Upon selling the firm's assets, respondent became an employee of Nations Title Agency of the Carolinas, a North Carolina corporation which is a subsidiary of Nations Holding; Nations Title is not a law firm.

Respondent was hired as a marketing executive with no intention of practicing law.

After the sale, Likens & Blomquist began doing business in South Carolina in association with Nations Title. All of the Hall Law Firm's non-lawyer employees became employees of Nations Title and all lawyers employed by the Hall Law Firm, except respondent, became employees of Likens & Blomquist. In Columbia, Likens & Blomquist shared office space with Nations Title and, until early 2004, the office door and exterior signs read only "Nations Title" with no indication of the law firm's presence.

While employed by Nations Title, the volume of business required respondent to act as supervising attorney for some closings. By supervising the closings, respondent recognizes he assisted Nations Title, a non-lawyer corporation, in the unauthorized practice of law. Following one such transaction, the borrower defaulted and the lender foreclosed, but the presiding Master–in–Equity declared the mortgage null and void and dismissed the foreclosure on the grounds that the transaction was tainted with illegality due to respondent engaging in the unauthorized practice of law by closing the transaction as a title company employee.[1]

Nations Title's procedures for closing refinancing transactions included sending a lawyer to close the loan at the borrower's home when a lawyer was available and sending a non-lawyer notary to close the loan at the borrower's home when a lawyer was not available. When a non-lawyer conducted a closing, a lawyer in Columbia was available by telephone and the borrower would sign a form disclosing that the closing was performed by a non-lawyer and that a lawyer was available by telephone if needed.[2]

Nations Title's closing procedures also included instructing borrowers to provide a person to serve as the second witness to the closing, as only one lawyer (or non-lawyer "closer") would be sent to conduct the closing. In cases where no

---

1. The case settled, accordingly, no issues were decided on appeal. Respondent was not a party to the foreclosure action.

2. This had also become the Hall Law Firm's practice shortly before its sale to Nations Title.

second witness appeared at the closing, the lawyer or closer would sign as the first witness to the execution of the mortgage then return it to Nations Title's office where an employee who was not present at closing and did not witness the execution of the mortgage would falsely sign the mortgage as the second witness.[3]

Approximately two months after the sale of his firm's assets to Nations Holding, respondent became an employee of Likens & Blomquist. He continued closing loans and supervising the Likens & Blomquist lawyers who closed loans.[4]

Nations Title and Likens & Blomquist employed several non-lawyers to perform title work and other closing-related work. In addition to their regular salary, they were paid $75 per closing performed outside the office. Respondent now acknowledges that many borrowers received inadequate legal advice as a result of this practice.

In response to *In the Matter of Lester*, 353 S.C. 246, 578 S.E.2d 7 (2003), issued in March 2003, respondent attempted to bring office procedures into conformity with the requirement of attorney presence at all closings. Respondent admits it took several months for these efforts to be successful and approximately two hundred refinancings were conducted in borrowers' homes by non-lawyer employees during April, May, and June of 2003 with no lawyer present.

Respondent's immediate response to the *Lester* opinion was to require any non-lawyer closer to telephone a lawyer during the closing to explain the HUD-1, note, mortgage, and three-day right of rescission to the borrower. The borrower's disclosure was altered to reflect the telephone call. In the weeks following the *Lester* opinion, respondent sought advice from colleagues and ethics experts regarding his procedures and the impact of the *Lester* opinion, but obtained no definitive

---

3. Respondent had disseminated an official office policy requiring a second witness at every closing, but admits this policy was generally disregarded until mid-2004.

4. It is unclear if Likens & Blomquist's closing procedures were exactly the same as those of Nations Title. Nevertheless, respondent fully accepts responsibility for real estate transactions which were conducted in violation of the Rules of Professional Conduct and the Court's precedent while he was employed by Likens & Blomquist.

advice. By the summer of 2003, respondent states he had eliminated the practice of non-lawyer closings.

Likens & Blomquist experienced a high turnover rate for lawyer employees, with many leaving due to dissatisfaction with the lack of conformity with the requirements of the Rule of Professional Conduct and this Court's pronouncements regarding real estate transactions. In early 2004, in response to complaints from departing attorneys and threats of reporting Likens & Blomquist to the Commission on Lawyer Conduct, respondent again attempted to bring office procedures in conformity with applicable ethical rules, this time including ending the practices of false witnessing and in-house unsupervised out-of-state disbursement. Respondent obtained counsel to review his procedures. Respondent implemented the recommended changes, including physically separating the facilities of Nations Title from those of Likens & Blomquist. By way of mitigation and not as a defense, respondent states that he was not aware of all of the shortcomings or the extent of the problems, but he nonetheless accepts responsibility for them.

Respondent represents, and ODC does not dispute, that after June 2004, respondent made massive efforts to take control of Likens & Blomquist and wrestle authority from the Nations Title managers and from the partners and managers in Kansas. Ultimately, respondent left Likens & Blomquist in 2005 due to his inability to force the firm to conform to the Rules of Professional Conduct and the Court's pronouncements regarding real estate transactions.

Respondent recognizes that the actions of Nations Title and Likens & Blomquist constituted the unauthorized practice of law and that, as the senior South Carolina attorney in the combined offices, he was responsible. Nevertheless, although he was an employee of Likens & Blomquist, the most senior South Carolina lawyer, and the supervisor of all other firm lawyers in South Carolina, respondent remained a subordinate of the non-lawyer managers of Nations Title. As such, respondent did not have authority to countermand decisions regarding Likens & Blomquist's policies and procedures, including the closing procedures described above.

Respondent has fully cooperated with ODC's investigation into this matter.

## LAW

Respondent admits that, by his misconduct, he has violated the following Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation); Rule 1.4 (lawyer shall explain matter to extent reasonably necessary to permit client to make informed decisions regarding representation); Rule 5.3 (lawyer shall be responsible for conduct of non-lawyer associates that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer); Rule 5.5 (lawyer shall not assist others in performing activities which constitute the unauthorized practice of law); and Rule 8.4(a) (it is professional misconduct for lawyer to violate the Rules of Professional Conduct). In addition, respondent admits that his actions constitute grounds for discipline under the Rule 7(a)(1), RLDE, Rule 413, SCACR (it shall be a ground for discipline for a lawyer to violate the Rules of Professional Conduct).

## CONCLUSION

We accept the Agreement for Discipline by Consent and suspend respondent from the practice of law for nine (9) months. Within fifteen (15) days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court demonstrating that he has complied with Rule 30, RLDE, Rule 413, SCACR.

**DEFINITE SUSPENSION.**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.