539 S.E.2d 396

**In the Matter of David Reed THOMPSON, Respondent.**

No. 25205.

Supreme Court of South Carolina.

Heard Sept. 6, 2000.
Decided Oct. 30, 2000.

Attorney General Charles M. Condon, and Senior Assistant Attorney General James G. Bogle, Jr., both of Columbia, for Office of Disciplinary Counsel.

Sherwood M. Cleveland and Clifford O. Koon, both of Rogers Townsend & Thomas, PC, of Columbia, for respondent.

PER CURIAM:

The Office of Disciplinary Counsel ("ODC") appeals the Panel's decision to indefinitely suspend David Reed Thompson ("Thompson") from the practice of law and requests disbarment.

### FACTS/PROCEDURAL BACKGROUND

Thompson was a single practitioner in Charleston, South Carolina. He exercised sole and exclusive control over his firm's financial records, client funds, and client files. Before practicing law in South Carolina, Thompson attended the University of North Carolina at Chapel Hill where he was awarded the John Motley Morehead Scholarship. After he completed his undergraduate education, Thompson was commissioned as an officer in the United States Marine Corps and served two tours of duty in Vietnam. He then graduated from the University of North Carolina School of Law in 1973. He subsequently married and is the father of three children. He practiced law in Goldsboro and Durham, North Carolina before settling in Charleston where he practiced law continuously until his temporary suspension on August 22, 1996.

Thompson began experiencing emotional problems in the early 1970s shortly after his return from Vietnam. In 1988, he was diagnosed with bipolar disorder and was hospitalized at the Veterans Administration Hospital in Charleston, South Carolina. His mental illness was exacerbated by the fact that he was also experiencing financial and marital difficulties.

On July 11, 1996, Thompson self-reported to the Supreme Court Commission on Lawyer Conduct that he had imbalances in his trust account he could not resolve. He met with George Tansil ("Tansil"), the chief investigator for the Commission, on August 9 and 15, 1996. On August 15, 1996, Thompson

consented to: (1) a temporary suspension from the practice of law; (2) the appointment of a trustee to administer his bank account; (3) the freezing of his accounts; and (4) an audit of his trust accounts. On August 22, 1996, the Supreme Court temporarily suspended Thompson from the practice of law and designated Kenneth C. Krawcheck ("Krawcheck") as trustee.

Thompson then moved to Washington, Pennsylvania where he attempted suicide. On August 25, 1996, he was involuntarily committed and hospitalized at the Medical University of South Carolina Medical Center ("MUSC") for the treatment of severe bipolar disorder. Thompson was released on September 9, 1996, pursuant to an order of the Probate Court finding him mentally ill and lacking "sufficient insight or capacity to make responsible decisions with respect to his treatment," and ordering that he undergo an outpatient treatment program at Charleston Area Mental Health Center for at least six months.

The Panel concluded that "based on the medical evidence in this case, during the period prior to and including 1995 and 1996, Mr. Thompson, by reason of his manic depressive state, did not have the requisite mental capacity and judgment to manage and direct his law practice or his financial affairs."

On September 13, 1996, the ODC filed a complaint alleging the following:

**The First Union Matter:** Thompson maintained a trust account with First Union that was closed on June 28, 1996, on the suspicion of check kiting.[1] Between July 1995 and June 1996, Thompson's First Union Trust Account showed negative balances on six occasions with the maximum overdraft of $23,031.00. Between December 1994 and May 1996, Thompson wrote eighteen checks from his First Union account for personal use totaling $62,184.00, including checks for an office painting, car maintenance, college tuition, the Boy Scouts, and his wife's property taxes.

**First Citizens Matter:** Thompson's First Citizens Trust Account reflected negative balances on twenty-five occasions with a maximum overdraft of $83,591.00. Eighteen trust

---

**1.** Check kiting is the artificial inflation of an account balance by using two or more trust or bank accounts from two or more different banks to create an artificial balance that would allow checks to be negotiated that normally would not have been negotiated had the kite not existed.

account checks were returned for insufficient funds. As a result of an audit by Chicago Title, as of October 4, 1996, there was shortage of $128,923.00 in his First Citizens Trust Account.

The Complaint also alleges that Thompson engaged in a complicated check kiting scheme and that he commingled personal funds into his trust accounts.

Thompson filed an Answer admitting to all of the factual allegations in the Complaint, but denying that he was capable of forming the requisite intent to engage in check kiting and denying all specific allegations pertaining to check kiting. He admitted that Chicago Title's audit showed a shortage of $128,923.00, but did not admit to the accuracy of the audit or to the amount of the shortage.

In 1997, pursuant to an interpleader action brought by Krawcheck, two accountants and the law firm Rogers, Townsend & Thomas were retained to analyze the trust accounts and determine the precise amount of the shortfall in the accounts. The total claims against the trust accounts were $319,773.00, which consisted of several small claims and the claims of Chicago Title and Green Tree Financial. All claimants were paid in full out of the trust account, pursuant to an order by the Master in Equity, except for Chicago Title and Green Tree Financial, each of which received a substantial amount of their claims from Thompson's malpractice carrier. Chicago Title and Green Tree Financial bore the $63,016.00 shortfall.[2]

On August 22, 1996, this Court placed Thompson on Temporary Suspension. On February 12, 1997, Thompson was transferred to Incapacity Inactive Status pursuant to Rule 28

---

2. The Panel found it significant that Thompson's malpractice carrier made payment on the claim despite an exclusion in the policy for fraudulent or willful acts. Furthermore, the Panel found it significant that Chicago Title and Green Tree Financial both stipulated to the following facts in the interpleader action: "[I]t has been brought to the Court's attention that Thompson, in order to assist in the resolution of this matter, retained two accountants to conduct an audit of the accounts where the funds at issue formerly were deposited, as well as the files of his law practice which were in the custody of the Plaintiff.... *The Court concludes, therefore, that Thompson should also be commended for his diligent efforts in assisting to bring this matter to closure.*" (emphasis added).

of the Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR. Dr. Donna Schwartz–Watts, Associate Professor of the University of South Carolina School of Medicine in the Department of Neuropsychology and Director of Forensic Services, examined Thompson in October 1998 to determine whether he should remain on Incapacity Inactive Status. Although she testified that Thompson had bipolar disorder, Dr. Schwartz–Watts testified that, in her opinion, Thompson knew the difference between right and wrong while committing acts of misconduct.

On April 2, 1999, this Court removed Thompson from Incapacity Inactive Status by Order consented to by Thompson and the Attorney General and returned him to Interim Suspension. A Panel Hearing was held in Columbia on August 19, 1999. Thompson did not attend the hearing because he currently lives in Japan, where he teaches English to Japanese students at Roosevelt University in Tokyo. However, Thompson was represented by counsel at the hearing.

Based on the testimony and uncontested medical evidence, the Panel concluded that Thompson suffered from "an aggravated and severe case of bipolar disorder beyond his control and ability to cope for a period of ten years." On December 10, 2000, the Subpanel issued a Report recommending an Indefinite Suspension from the practice of law until "he is able to demonstrate by competent medical evidence that he has sufficiently recovered from bipolar disorder disease to the point of being able to exercise the discretion and judgment necessary to practice law." The ODC filed Exceptions and a Supporting Brief on January 10, 2000. On February 15, 2000, the Panel advised the parties that it was adopting the Subpanel's Report. The ODC appealed the decision of the Panel and requests that this Court disbar Thompson. The following issues are before this Court:

I. Did the Panel err by failing to present findings of fact in support of misconduct, proven by clear and convincing evidence, as required by Rule 26(c)(7) of the Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR?

II. Did the Panel err by failing to present violations of the Rules of Professional Conduct, Rule 407, SCACR, where Thompson admitted to these violations in his

interview with Tansil, and where the violations were supported by the record?

III. Did the Panel err in finding Thompson lacked the mental capacity to commit the misconduct?

IV. Did the Panel err by failing to recommend disbarment?

V. Did the Panel err by failing to assess the costs of these proceedings?

## LAW/ANALYSIS

### I. Findings of Fact

The ODC argues the Panel erred by failing to present findings of fact in support of misconduct, proven by clear and convincing evidence, as required by Rule 26(c)(7) of the Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR. We agree.

Rule 26(c)(7) directs the Subpanel or hearing officer to "file a report with the hearing panel setting forth the findings of fact and conclusions of the subpanel or hearing officer." The Panel presented several examples of Thompson's misconduct, including examples of check kiting, overdrafts, and commingling. Thompson admitted to all of the factual allegations in the Complaint except for his ability to form the requisite intent to engage in check kiting. The Panel, therefore, focused primarily on the mitigating facts of: (1) Thompson's severe bipolar disorder; (2) his cooperation with the investigation; and (3) his efforts to effect restitution.

While the Panel's recommendation included the details of the First Union and First Citizens Matters, the recommendation did not sufficiently detail all of Thompson's misconduct. The ODC describes the following acts of misconduct in its brief:

1. Depositing $11,755.17.00 of personal funds into his First Citizens trust account to cover client funds that may have been insufficient due to his misconduct.

2. Obtaining loans from other banks and placing them into his trust account at First Citizens.

3. **The Blanding Matter:** Thompson's Disbursement Sheet does not show a $300,000.00 check for the Blanding real estate transaction. A trust account check, made payable to Thompson in the amount of $300,000.00, was falsely labeled and had an incorrect file number.

4. **The Cox Matter:** The Cox Matter is an example of check kiting. Thompson also wrote a check for $35,000.00 payable to himself but labeled "Cox" and with an incorrect file number.

5. **The Bryant Matter:** Another example of check kiting and false information on checks and/or deposit tickets.

6. Thompson misappropriated approximately $4,000.00 from his First Citizens Trust Account.

7. Thompson admitted in his interview with Tansil that a number of checks and deposit tickets were manufactured by him and put into the flow of commerce. On many of these checks, Thompson placed a false client name or file number to make the check or deposit ticket appear legitimate.

8. According to the ODC, approximately thirty-three checks totaling $1,514,206.55 were used in a check kiting scheme, although neither bank lost money as a result of the scheme.

9. As a result of the Chicago Title audit, varying amounts of shortages were found in Thompson's trust accounts, including a shortage of $128,923.31 on October 4, 1996.

10. A check for $1,030.00 from Thompson as closing fees for the Smith/Sibert transaction was returned by the bank to First Choice Mortgage, marked "refer to maker."

Each of these acts was proved before the Panel by clear and convincing evidence. According to the Panel, its recommendation was based on the testimony of: (1) Dr. Thomas Whiteside, Thompson's treating physician; (2) William Thompson, Thompson's brother; (3) Colonel Larry Ward, Thompson's former office manager and friend; and (4) Thompson's extensive medical history. The Panel did not provide sufficient details of Thompson's misconduct in their Recommendation.

For this Court to properly review this matter, the full extent of Thompson's misconduct must be evaluated. Based on the severity of Thompson's financial misconduct as presented in evidence before the Panel, as described in the Panel Report and as summarized in the ODC's brief, we disbar Thompson.

## II. Violations of the Rules of Professional Conduct

■ The Attorney General's office argues that the Panel erred by failing to set forth Thompson's violations of the Rules of Professional Conduct, Rule 407, SCACR. We agree.

Thompson argues that because he admitted to all of the misconduct alleged by the ODC, it was unnecessary for the Panel to address his ethical violations. However, for this Court to properly review this matter and decide upon an appropriate sanction, the Panel should set forth the Rules of Professional Conduct Thompson violated.

Specifically, Thompson violated the following Rules of Professional Conduct, Rule 407, SCACR: (1) Rule 1.1, competence; (2) Rule 1.2, scope of representation; (3) Rule 1.3, diligence and promptness in representing a client; (4) Rule 1.15, misappropriation of client funds; (4) Rule 8.4(a), violation of a Rule of Professional Conduct; (5) Rule 8.4(b), committing a criminal act that reflects adversely on honesty, trustworthiness, or fitness as a lawyer in other respects; (6) Rule 8.4(c), moral turpitude; (7) Rule 8.4(d), conduct involving dishonesty, fraud, deceit, or misrepresentation; and (8) Rule 8.4(e), conduct prejudicial to the administration of justice.[3]

## III. Mental Capacity

■ The ODC argues the Panel erred in finding Thompson lacked the mental capacity to commit the misconduct. We agree and decline to accept Thompson's assertion of impair-

---

**3.** Because these matters occurred prior to September 1, 1997, the ODC identified additional violations under the former Rules on Disciplinary Procedure: (1) violation of the oath of office taken upon admission to the practice of law; (2) conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute, or conduct demonstrating unfitness to practice law; (3) conduct demonstrating a lack of professional competence in the practice of law; and (4) conduct in violation of the Rule of Trust Accounts of Attorneys.

ment as mitigation in light of the serious misconduct committed.

The medical testimony demonstrates that Thompson suffered from severe bipolar disorder. The Panel had to determine whether the medical evidence served to mitigate Thompson's misconduct. According to the Panel's Recommendation, "Based on the medical evidence in this case, during the period prior to and including 1995 and 1996, Mr. Thompson, by reason of his manic depressive state, did not have the requisite mental capacity and judgment to manage and direct his law practice or his financial affairs." However, the Panel acknowledges in its report that Dr. Schwartz–Watts testified that "[Thompson] knew the difference between right and wrong while committing acts of misconduct."

Thompson demonstrated mental competency through his complicated financial scheme. Many of the activities Thompson participated in required foresight, extensive planning, and the ability to coordinate complex tasks. For example, Thompson initiated a complex check kiting scheme that involved keeping track of approximately $1,514,206.55. To effectuate his scheme, Thompson had to borrow money from a credit union and had to pay loans to his trust accounts in order to keep the appropriate balance. Thompson also had the wherewithal to use money from his trust accounts to pay for personal items such as college tuition and property taxes.

This is a tragic case and we understand the struggle the Panel had in reaching its recommendation. Nevertheless, while we emphasize that this Court considers mitigation factors such as mental illness and restitution in attorney discipline matters, we disbar Thompson because his mental illness does not excuse the long term pattern and scheme of misconduct in this case.

## IV. Disbarment

The ODC argues that the level of misconduct in this case supports disbarment. We agree.

This Court has the sole authority to discipline attorneys and to decide the appropriate sanction after a thorough review of the record. *Matter of Holt*, 317 S.C. 48, 451 S.E.2d 884 (1994); *see also Matter of Kirven*, 267 S.C. 669, 230 S.E.2d

899 (1976). While this Court may draw its own conclusions and make its own findings of fact in an attorney disciplinary matter, the unanimous findings and conclusions of the Panel are entitled to much respect and consideration. *Matter of Larkin,* 336 S.C. 366, 520 S.E.2d 804 (1999).

In light of the serious misconduct committed, disbarment is justified in this matter. "The primary purpose of disbarment or suspension is the removal of an unfit person from the profession for the protection of the courts and the public, not punishment of the offending attorney." *Matter of Nelson,* 333 S.C. 498, 510 S.E.2d 718, 722 (1999) (citations omitted). Disbarment in this case is neither excessive nor disproportionate to sanctions imposed by this Court in similar cases involving misappropriation and other similar acts of financial misconduct. *See, e.g., Matter of Hendricks,* 319 S.C. 465, 462 S.E.2d 286 (1995) (holding attorney who misappropriated funds, neglected client matters, and practiced law while under suspension warranted disbarment despite claims of mitigation based on physical and mental impairment.); *Matter of Bowers,* 303 S.C. 282, 400 S.E.2d 134 (1991) (holding attorney who misappropriated client funds in order to invest in future trading options warranted disbarment despite the "disease of pathological gambling.").[4]

The Panel based its Recommendation to indefinitely suspend Thompson on the holdings in *Matter of Howey,* 267 S.C. 430, 229 S.E.2d 264 (1976) and *Matter of Howle,* 294 S.C. 244, 363 S.E.2d 693 (1988) because both cases involved attorneys with bipolar disorder. However, each of these cases can be distinguished from the instant matter. In *Matter of Howey* this Court simply held that Howey had a debilitating mental disorder and that he "should be suspended from the practice

---

4. The ODC cites two New Jersey cases that held an attorney's bipolar disorder did not justify a sanction less than disbarment where attorney committed misconduct similar to the instant case. *See Matter of Tonzola,* 162 N.J. 296, 744 A.2d 162 (2000); *Matter of Greenberg,* 155 N.J. 138, 714 A.2d 243 (1998). However, New Jersey has abandoned the practice of weighing mitigating circumstances when disciplining attorneys who misappropriated client funds. *See Matter of Wilson,* 81 N.J. 451, 409 A.2d 1153 (1979). South Carolina does not have a bright line test similar to New Jersey's. This Court considers mitigating factors such as mental illness, restitution, and cooperation in all attorney disciplinary proceedings.

of law for the duration of his mental illness." 267 S.C. at 431, 229 S.E.2d at 265. According to this Court, Howey could not apply for reinstatement until he demonstrated for at least one year that he had regained his mental faculties. *Id.* The Court suspended Howey from the practice of law only because of his mental illness, not because of any violation of the Rules of Professional Conduct. Thompson's situation is dramatically different because the record is replete with evidence of mental illness *and* misconduct. *Matter of Howey,* therefore, does not control.

In *Matter of Howle, supra,* this Court held the mishandling of client funds, directly traceable to manic depressive episodes, warrants only a two-year suspension. The facts of *Matter of Howle* are similar to the instant case because both cases involved a respondent who: (1) conceded to unethical conduct; (2) mishandled client funds; and (3) suffered from bipolar disorder. However, Howle completely reimbursed his law firm for any money that was unlawfully disbursed from his law firm's trust accounts. *Howle,* 294 S.C. at 245–246, 363 S.E.2d at 693–694. Furthermore, Thompson mishandled his client's money on a much larger scale than Howle. Howle had to repay approximately $12,000.00 to his law firm for his misconduct. Although Thompson repaid some of the money he mishandled, he: (1) used approximately $62,184.00 of client money for personal use; (2) had maximum overdrafts of $23,031.00 and $83,591.00 from his First Union and First Citizens trust accounts; (3) had to have his malpractice carrier pay some of the claims against his trust accounts, which still left a $63,016.00 shortage; (4) issued falsely labeled trust account checks; and (5) participated in a complicated check kiting scheme. Finally, the Court in *Howle* was persuaded by the medical evidence that Howle was recovering from bipolar disorder through his treatment with an antidepressant drug. In fact, Howle's treating physician fully endorsed his rehabilitation and return to law practice. *Id.* at 247, 363 S.E.2d at 695. Thompson has not received such a favorable prognosis from any of the physicians in this case.

Although *Howey* and *Howle* both concern bipolar disorder, they are factually distinguishable from the instant case and

are not persuasive. We, therefore, disbar Thompson based on his pattern of severe financial misconduct.

## V. Costs

■ The ODC argues the Panel erred in failing to assess the costs of these proceedings.[5] We agree.

The assessment of costs is in the discretion of the Court. Under the current Rules, "[t]he Supreme Court may assess costs against the respondent if it finds the respondent has committed misconduct." Rule 27(e)(3), Rules for Lawyer Disciplinary Enforcement; Rule 413, SCACR. Furthermore, pursuant to Rule 7(b)(8), this Court can impose, as a sanction for attorney misconduct, an "assessment of the costs of the proceedings, including the costs of the hearings, investigations, service of process and court reporter services." Rule 413, SCACR. Based on the severity of Thompson's wrongdoings, we assess the costs of the proceedings against him.

### CONCLUSION

Accordingly, we hereby **DISBAR** Thompson effective the date of this opinion. Within thirty days of the date of this opinion, Thompson shall file an affidavit with the Clerk of Court showing he has complied with Rule 30, RLDE, Rule 413, SCACR.

---

5. The Complaint and Second Complaint did not specifically plead an assessment of costs. However, the documents did include a request that the Panels and this Court take such action as is "appropriate", which would include the sanctions specified in Rule 7(b) of the Rules for Lawyer Disciplinary Enforcement. Rule 413, SCACR.