689 S.E.2d 623

**In the Matter of Charles E. JOHNSON, Respondent.**

No. 26774.

Supreme Court of South Carolina.

Heard Nov. 30, 2009.

Decided Feb. 16, 2010.

Henry Dargan McMaster, Attorney General, and James G. Bogle, Jr., Senior Assistant Attorney General, both of Columbia, for Office of Disciplinary Counsel.

Charles E. Johnson, pro se, of Columbia.

PER CURIAM.

In this disciplinary matter, the Office of Disciplinary Counsel (ODC) brought formal charges against Respondent Charles E. Johnson arising out of his alleged neglect of a client's case and his failure to follow proper procedures in numerous real estate closings. In one particular closing, ODC alleged Respondent was not present at the closing. In another closing, ODC alleged Respondent was responsible for a real estate transaction involving mortgage fraud. A Hearing Panel of the Commission on Lawyer Conduct ("the Panel") found ODC's allegations to be true and recommended an indefinite

suspension as a result of the misconduct. We agree with the Panel in substantial part, but we find ODC failed to meet its burden of proof that Respondent actively participated in the transaction involving mortgage fraud. Based on the proven misconduct, we suspend Respondent for one year from the practice of law.

## I.

### a. Longwood Matter

On February 20, 1998, Pamela Longwood and Beverly Sumter retained an associate with Respondent's firm to represent them regarding an automobile accident that had occurred just days prior. Longwood and Sumter, who are cousins, informed the associate that they were involved in an accident with James Usher and that Sumter was the driver and Longwood was her passenger. Subsequently, the associate left Respondent's firm, and Respondent assumed representation in May 1999. In July 1999, Usher filed suit against Sumter, the at-fault driver. As a result of this suit, Respondent learned of a potential conflict of interest between Sumter and Longwood and terminated his representation of Sumter. In April 2001, two months after the expiration of the statute of limitations, Respondent filed suit against Usher and Sumter, despite Longwood's continued instructions not to file suit against her cousin.[1] The case was dismissed as time-barred.

### b. Cantey Closing Matter

Amanda Cantey purchased a home in which her father, Amos Price, was the co-signor. Respondent served as the closing attorney, and Joseph Wright served as the broker. The closing documents indicated that the closing took place on October 2, 2001. ODC alleged Respondent could not have been present at the closing at his office in Columbia because he was attending the public defenders conference in Myrtle Beach on this date.

---

1. Respondent attempted to serve Sumter, but the pleadings were returned for non-service.

### c. Amos Price/Joseph Wright Matter

On November 29, 2001, approximately two months after the Cantey closing, Respondent conducted a closing on a $340,000 home located in the Spring Valley subdivision in Columbia. The HUD statement indicated that Amos Price, Cantey's father, was the borrower and the purchaser of the home. In 2003, the mortgage company began contacting Price regarding his failure to make mortgage payments on the Spring Valley home. Price and his family informed the mortgage company that he had not purchased the home, and he did not know how or why the mortgage was listed under his name.

An investigation revealed that Joseph Wright, the broker involved in the Cantey closing, had assumed Amos Price's identity and had moved into the home. Wright was indicted for financial identity fraud and pled guilty to forgery. ODC alleged Respondent knowingly participated, either directly or indirectly, in the fraudulent transaction.

### d. Various Real Estate Closing Matters

ODC examined a number of Respondent's files involving real estate closings. ODC presented HUD statements and disbursement statements from thirteen unrelated closings conducted by Respondent to the Panel. The statements contained numerous and significant financial discrepancies.

### II.

At the hearing before the Panel, Sumter and Longwood testified that Respondent never warned them of the potential conflict of interest. Moreover, Sumter testified that Respondent did not obtain her consent to sue her despite her status as a former client. Longwood testified that she had specifically instructed Respondent not to sue Sumter and never directed him otherwise.

Regarding the Cantey closing, Amanda Cantey testified that Respondent was not at the closing on October 2, 2001. Cantey stated that she, her husband, Wright, and Beulah Stallings, who is Respondent's secretary and sister, were the only individuals present at the closing. She testified she had never been to Respondent's office prior to this closing and that only one meeting took place. Cantey further testified the signa-

tures on the documents relating to the Spring Valley closing were not her father's signatures, her father was not involved in the Spring Valley home purchase, and he was unaware of Wright's actions.[2]

ODC called Wright to testify as to the Price/Wright matter. He testified that he had received the loan closing documents from the lender and then compiled the forged documents prior to the closing. He admitted that he had contacted Amanda Cantey and Amos Price and falsely told them he needed to make another copy of Price's driver's license for the Cantey file. Wright stated that the closing took place in Respondent's office and Respondent was not present, but Stallings was present at the closing. Wright maintained that he acted alone in forging the documents and neither Respondent nor Stallings had knowledge of his scheme. Respondent declined to cross-examine Wright.

As to the various real estate closings that ODC examined, ODC called Andrew Syrett to testify. Syrett served as the seller's attorney and Respondent represented the buyer in a transaction in which the buyer had been renting the home on a lease/purchase contract. Syrett testified Respondent drafted a HUD statement indicating a refinancing transaction, yet the transaction was clearly a purchase transaction. Syrett testified that Respondent prepared an incorrect HUD statement and an incorrect deed. Syrett instructed his client not to sign either document, and he subsequently redrafted the documents correctly.

In addition to witness testimony, ODC submitted HUD and disbursement statements from twelve other real estate closings, all of which contained numerous financial discrepancies and inaccuracies. In essence, the files contained HUD statements which did not match the disbursement sheets and did not match the checks drawn on Respondent's trust account. The documents included inaccurate numbers for cash advanced to the borrower, processing fees, and the price of the homes.[3]

---

**2.** Amos Price was deceased by the time this hearing was held.

**3.** The amount of the inaccuracies ranged from hundreds to thousands of dollars. Wright acted as the mortgage broker in several of these closings.

Stallings testified on Respondent's behalf at the hearing. Concerning the Cantey closing, she maintained all the parties were present and had executed the closing documents at a "dry closing" that took place the Friday before October 2.[4] Stallings also testified as to the Price/Wright matter. She stated Wright arrived at Respondent's office with a man she believed to be Amos Price, she made copies of the driver's license that he presented to her, which indicated he was Amos Price, and she recognized the man as Amos Price from the October 2 closing. Stallings testified Wright did not bring in pre-signed documents because "[Wright] know[s] we wouldn't do that." She further testified that she witnessed the man sign "Amos Price" on the documents.

Finally, Respondent testified. He admitted he neglected Longwood's case in failing to file her claim within the statute of limitations. However, he claimed he drafted pleadings in February 2001, but Longwood refused to come to his office to review them. He indicated the reason he knowingly filed the claim outside the statute of limitations was because he thought he may be able to obtain a settlement offer from the insurance company.

Respondent admitted he was in Myrtle Beach on October 2 and acknowledged that the closing could not possibly have occurred on that date. Respondent testified that, although he could not recall what exactly transpired, "the only thing [he] can think of" was that a dry closing took place the Friday before in which the parties executed the documents.[5]

Regarding the Price/Wright closing, Respondent insisted that Wright brought in a man who purported to be Amos Price. Respondent testified that Wright told him Price was his grandfather and that Price intended to purchase the home for Wright's use. He too asserted that he recognized Price

4. According to Respondent, a "dry closing" is a closing where the documents are executed, but funds are not exchanged and the property is not transferred until days later. On cross-examination, ODC pointed out that Stallings never mentioned a dry closing in her testimony at the Notice to Appear hearing.

5. Similar to Stallings' testimony, ODC pointed out that Respondent also never mentioned a dry closing in his testimony at the Notice to Appear hearing.

from the Cantey closing and that the man brought in a driver's license indicating he was Amos Price. Respondent could not offer an explanation as to why Wright "lied" to the Panel in saying he brought pre-signed documents to the closing. On cross-examination, Respondent admitted he was "shocked" that Amos Price was approved for a loan for $340,000 for the Spring Valley home after co-signing on Cantey's loan just a month earlier. Similarly, at oral argument, Respondent acknowledged that he was concerned with the nature of this transaction from an economic standpoint.

The Panel found that Respondent's actions in failing to file suit on behalf of Longwood within the statute of limitations and in suing Sumter against Longwood's instructions constituted misconduct. Regarding the Cantey closing, the Panel found clear and convincing evidence that Respondent allowed a non-lawyer to conduct a real estate closing, to sign his name to the HUD document, and to notarize a document bearing his signature that falsely reflected that he was present on October 2. As to the Price/Wright matter, the Panel noted that this matter was most troubling to the Panel and that it was a question of credibility. The Panel found by clear and convincing evidence that Wright committed fraud by forging the closing documents and obtaining a loan in Price's name and found that Price was not present at the closing. The Panel ruled that by allowing criminal activity to occur in his office, Respondent violated the Rules of Professional Conduct. Finally, regarding the thirteen closings containing inaccurate HUD and disbursement statements, the Panel noted that although there were no allegations of misappropriation of funds, the transactions did implicate Respondent's trust account and found that Respondent's actions in this matter constituted misconduct.

## III.

This Court has the sole authority to discipline attorneys and to decide the appropriate sanction after a thorough review of the record. *In re Thompson*, 343 S.C. 1, 10, 539 S.E.2d 396, 401 (2000). We "may accept, reject, or modify in whole or in part the findings, conclusions and recommendations of the [Panel]." Rule 27(e)(2), Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR. While this Court may

draw its own conclusions and make its own findings of fact in an attorney disciplinary matter, the unanimous findings and conclusions of the Panel are entitled to much respect and consideration. *In re Thompson,* 343 S.C. at 11, 539 S.E.2d at 401. ODC carries the burden of proof and most prove misconduct by clear and convincing evidence. Rule 8, Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR.

## IV.

Respondent challenges the Panel's findings as to all four matters. Specifically, Respondent claims there was not clear and convincing evidence to support the allegations in the Price/Wright matter, there was no testimony contradicting his version of the Cantey closing, and the Panel's report contains no allegations of misconduct in the thirteen real estate closings. While he admits he violated Rule 1.3 (diligence) of the Rules of Professional Conduct, Rule 407, SCACR, in the Longwood matter, he claims the Panel's further findings of misconduct related to this matter are not supported by clear and convincing evidence and the proper sanction is an admonition.

We find that Respondent's actions in the Longwood matter violated the rules on conflicts of interest as well as the rules on competence and diligence. Longwood and Sumter made a full disclosure to Respondent regarding the accident. Respondent should have informed Sumter and Longwood of the potential conflict of interest before he agreed to represent both of them. Respondent clearly neglected this matter by filing Longwood's suit after the statute of limitations had expired and by filing it against Sumter in direct contravention to Longwood's instructions. We give no credence to Respondent's assertion that Longwood refused to come to his office to review the pleadings, for it was Respondent's responsibility to ensure that his client review the pleadings before the eve of the expiration of the statute of limitations.

Next, we find that Respondent violated the Rules of Professional Conduct in the Cantey closing. We agree with the Panel's findings that Respondent allowed a non-lawyer to conduct a real estate closing and sign his name to a HUD statement. We find that Respondent's and Stallings' assertion

regarding a prior "dry closing" lacks credibility. Neither Respondent nor Stallings mentioned a dry closing in their testimony at the Notice to Appear hearing. Cantey unequivocally testified that she went to Respondent's office only one time, Respondent was not present, and there had been no dry closing. Regardless of any purported dry closing, Respondent allowed Stallings to notarize a document indicating that Respondent was present on October 2, when in fact, he was not.

■ In our view, the Price/Wright matter is extremely troubling and is the most serious of the allegations. As stated above, we find Cantey's testimony that Respondent was not present at her closing is credible. Thus, Respondent would likely not be in a position to identify Amos Price. Moreover, one could reasonably question why Wright would provide false testimony, before the Panel and at his guilty plea, by asserting that he brought pre-signed documents to the closing. In both proceedings, Wright's testimony was consistent, and he openly admitted his actions. Wright did not shift blame or implicate anyone but himself and consistently maintained that neither Respondent nor Stallings was involved in or aware of his fraudulent scheme to assume Amos Price's identity.[6] In our view, Stallings' and Respondent's version of events is problematic, yet we must examine the evidence through the lens of the clear and convincing standard.

Applying this heightened standard, we find that ODC did not meet its burden of proving the allegation that Respondent actively participated in this fraudulent scheme. Neither Respondent nor Stallings was ever indicted for any offense arising out of this matter, and the only evidence ODC presented in support of this allegation was Wright's testimony. In our view, this does not rise to a level of clear and convincing evidence that Respondent was an active participant in the fraud and forgeries. While we do not overlook or disregard the undisputed fact that serious criminal conduct occurred in Respondent's office, we do not find that ODC established Respondent's knowing participation in the fraudulent scheme.

---

6. We do not intend to commend Wright for his actions or to excuse his criminal conduct. We are examining and analyzing Wright's testimony solely for the purpose of ascertaining how a criminal was able to perpetrate serious mortgage fraud involving identity theft in a lawyer's office.

We view Respondent's conduct in line with his general slack and casual approach to real estate closings, perhaps explaining Wright's choice of Respondent as the closing attorney for his fraudulent scheme.

■ Finally, we agree with the Panel's finding that the numerous inaccurate closing documents reflect Respondent's loose approach in the handling of real estate closings. The HUD statements and disbursement sheets reflected incorrect, inaccurate, and sometimes missing important information. This court takes real estate transactions very seriously, and we have consistently issued harsh sanctions against attorneys who do not conduct closings in accordance with proper procedures. *See In re Moore*, 382 S.C. 610, 677 S.E.2d 598 (2009) (suspending attorney for one year for failing to follow proper procedures in real estate closings); *In re Hall*, 370 S.C. 496, 636 S.E.2d 621 (2006) (imposing a nine-month suspension where lawyer served as the senior South Carolina attorney for a national title agency company that conducted closing which did not follow proper closing procedures). Moreover, not only did Respondent's files indicate failure to follow proper closing procedures, they also reflected failure to properly maintain his trust account. In our view, this evidence establishes a consistent pattern of negligence, inattention, failure to supervise, and an overall cavalier attitude and approach to real estate transactions, his client's interests, and the practice of law.

We recognize that this disciplinary matter was highly contentious. We commend the Panel for conducting a thorough hearing and completing a careful assessment in making their fact-finding determinations.

## V.

By his misconduct in the Longwood matter, we find Respondent violated the following Rules of Professional Conduct, Rule 407, SCACR: 1.1 (competence); 1.2 (scope of representation); 1.3 (diligence); 1.7 (lawyer shall not represent a client if representation is adverse to another client's interests unless both clients consent); and 1.9 (lawyer owes a duty of loyalty to former clients). As to the Cantey closing, we find Respondent violated the following Rules of Professional Conduct Rule 407, SCACR: 1.1 (competence); 1.3 (diligence); 5.3 (addressing

responsibilities for non-lawyer assistants); 5.5 (lawyer shall not assist another in the unauthorized practice of law); and 8.4(a) and (e) (lawyer shall not violate the Rules of Professional Conduct or engage in conduct that is prejudicial to the administration of justice). Lastly, regarding the thirteen real estate closings containing inaccurate closing documents, we find Respondent violated the following Rules of Professional Conduct, Rule 407, SCACR: 1.1 (competence); 1.3 (diligence); 4.1(a) (lawyer shall not make a false statement of material fact to third persons); 5.3 (addressing responsibilities for non-lawyer assistants); and 8.4(a) (lawyer shall not violate Rules of Professional Conduct).

As to mitigating factors, we have considered the fact that Respondent was admitted to the South Carolina Bar in 1985 and has no prior disciplinary history. Additionally, as noted above, Respondent was not indicted as a result of the Price/Wright matter.

We hold that a sanction of a one year definite suspension is warranted in light of Respondent's misconduct, especially his neglect in supervising real estate transactions. In issuing this sanction, we especially considered the fact that serious criminal conduct was so easily perpetrated in his office while under his watch and control. *See In re Johnson*, 375 S.C. 499, 654 S.E.2d 272 (2007) (issuing a definite suspension of one year where attorney unknowingly assisted others in perpetrating real estate fraud by failing to adequately investigate the facts surrounding the circumstances of the loans); *In re Helton*, 372 S.C. 245, 642 S.E.2d 573 (2007) (indefinitely suspending a lawyer who allowed closings to be conducted by his non-lawyer assistants, was not present when the closing documents were executed, improperly witnessed documents, and failed to review the closing documents).

Respondent has exhibited a pattern of a careless approach to real estate closings. Accordingly, we suspend Respondent for one year effective the date of this opinion and direct Respondent to pay the costs of these proceedings. We further order Respondent to participate in the LEAP program.

**DEFINITE SUSPENSION.**

TOAL, C.J., WALLER, PLEICONES, BEATTY and KITTREDGE, JJ., concur.