# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In the Matter of Robert Ryan Breckenridge, Respondent.

Appellate Case No. 2015-000181

―――――――――――

Opinion No. 27625
Heard June 2, 2015 – Filed April 20, 2016

―――――――――――

## PUBLIC REPRIMAND

―――――――――――

Lesley M. Coggiola, Disciplinary Counsel, and Barbara
M. Seymour, Deputy Disciplinary Counsel, both of
Columbia, for Office of Disciplinary Counsel.

Robert Ryan Breckenridge, of Greenville, *pro se*.

―――――――――――

**ACTING JUSTICE TOAL:** In this attorney disciplinary matter, the Office of
Disciplinary Counsel (ODC) filed formal charges against Respondent, alleging that
in a residential real estate transaction, Respondent failed to: properly supervise the
disbursement of funds; maintain proper records; disclose to his clients the actual
disbursement of their loan proceeds, including his sharing of legal fees with non-
lawyer third parties; and ensure that the representations in the HUD-1 settlement
statement (HUD-1 statement) matched the actual disbursements of loan proceeds.
Following a hearing, the Hearing Panel of the Commission on Lawyer Conduct
(the Panel) found that Respondent committed misconduct by violating Rules
1.5(b), 5.3, and 5.4 of the Rules of Professional Conduct (RPC), Rule 407,
SCACR, and Rule 417, SCACR. The Panel recommended the following
sanctions: public reprimand; assessment of the costs of the proceedings; and
completion of the Legal Ethics and Practice Programs (LEAPP) Ethics School and
Trust Account School. We agree with the Panel's recommendation, and impose the
recommended sanctions. Additionally, for the benefit of the Bar, we take this

opportunity to address an attorney's duty in supervising disbursements of loan proceeds in residential real estate transactions.

## FACTS/PROCEDURAL BACKGROUND

### *Background*

At the time of the hearing before the Panel, Respondent's practice consisted of conducting residential real estate closings. According to Respondent, he worked as an independent contractor for Carolina Attorney Network, a management service located in Lexington and owned by a non-lawyer. Carolina Attorney Network provides its services to title companies, and coordinates the residential real estate closing process by contracting with attorneys who act as closing agents. Respondent testified that over 99.9% of his business comes from Carolina Attorney Network.

Vantage Point Title, Inc. is a non-lawyer-owned title company doing business out of Florida. According to Respondent, Vantage Point Title produces title insurance policies, disburses funds, and prepares the title commitments for closings. While the lender prepares loan documents, Vantage Point Title prepares the HUD-1 statement.

Vantage Point Title refers closings and sends closing packages to Carolina Attorney Network, which in turn, assigns closings to its contract attorneys, including Respondent.[1] Carolina Attorney Network then sends the assigned attorney the documents via e-mail prior to the closing. When Respondent is assigned a closing, he testified that he reviews the title opinion, the closing instructions, and the HUD-1 statement. Respondent does not, however, review the title commitment or verify the loan payoff amount. After Respondent conducts the closing, he returns the closing package containing the executed loan documents to Vantage Point Title, along with an authorization to disburse the funds.

Upon receipt of the executed loan documents, Vantage Point Title disburses the funds, files the satisfaction of the executed mortgage, files the new mortgage,

---

[1] Respondent had no direct contact with Vantage Point Title. If Respondent had a problem with any loan documents, he contacted someone at Carolina Attorney Network, who in turn, contacted Vantage Point Title.

and issues the title policy. Vantage Point Title then sends Respondent a disbursement log showing how the closing funds were disbursed.

Respondent testified that he reviewed disbursement logs to ensure that they were "zeroed out"—or in other words, that there was no balance or no negative number after the transaction is complete. According to Respondent, as long as he saw a "zero balance," he "assumed" that everything had "been done correctly." He stated that even without verification that a deposit was made, or that checks actually cleared, he considered the disbursement log a "verification that [Vantage Point Title did] everything [it is] supposed to do . . . ."

Furthermore, Respondent testified that he had no first-hand knowledge of Vantage Point Title's disbursement process except for what was reflected on the disbursement logs he received, and that he had no signatory authority on any of the lender or Vantage Point Title's accounts. Vantage Point Title deposits closing funds into an account at Wells Fargo Bank, which includes closing funds for borrowers in all states. Therefore, Vantage Point Title does not place closing funds in an attorney trust account.

Finally, Respondent or an employee of Carolina Attorney Network verifies that the new mortgage has been recorded. Vantage Point Title pays Carolina Attorney Network $250 for the closing. Carolina Attorney Network then pays Respondent $150.

### The Francis Closing

In June 2012, Respondent conducted a residential real estate closing for John and Dorothea Francis, who were refinancing their home mortgage. The Francises' lender contracted with Vantage Point Title, who referred their closing to Carolina Attorney Network. Carolina Attorney Network assigned the closing to Respondent.

When asked whether he had any recollection of the Francis closing, Respondent testified that he did not because he had conducted at least 5,000 transactions in the past five years. He explained further that while he could not remember the specifics of the Francis closing, he could "tell you how pretty much every single one of my transactions occurs" because it is "a pretty repetitive process." Respondent then explained the closing process as follows.

Prior to the closing, Respondent received the title search results for the Francises' closing and verified that a South Carolina attorney completed the title opinion. Respondent also acknowledged that the HUD-1 statement "looked like it should have looked." Further, Respondent testified that he would have obtained the Francises' signatures on a dual representation disclosure form. However, Respondent neither disclosed to the Francises that he was splitting the attorney's fee with Carolina Attorney Network, nor did he disclose to them the details of the disbursement.

After Respondent returned the closing documents for the Francis closing to Vantage Point Title, he received and reviewed the disbursement log. Specifically, Respondent reviewed the disbursement log to ensure it showed a zero balance. However, despite the fact that the disbursement log showed a zero balance, the receipts and disbursements did not actually "zero out." The disbursement log showed a credit of $104,907 and total debits of only $801.30, leaving what should have been calculated as a balance of $104,105.30. As it turns out, the loan had been "net funded,"[2] and the lender did not disburse $104,907 to Vantage Point Title to pay off the original mortgage. Therefore, in the Francis closing, the disbursement log was not accurate.

At the time of the closing, however, Respondent did not know the loan had been net funded. In fact, Respondent admitted that at the time of the closing, he did not know exactly how much money was going to be disbursed or to whom, because he was unaware that the lender was net funding the transaction.

Therefore, the lender paid Vantage Point Title $801.30[3] to fund the closing, $250 of which was attorney's fees paid to Carolina Attorney Network (who then paid Respondent $150).[4] In other words, the $801.30 amount is considered the

---

[2] The fact that the transaction was net funded means that because the same lender held both the original mortgage and the refinancing, the lender transferred the funds "in-house" to pay off the original mortgage rather than wiring the money elsewhere at the time of the refinancing.

[3] As indicated by the HUD-1 statement, the $801.30 amount is the sum of $785.30 "total title charges" and a $16 recording fee.

[4] The HUD-1 statement does not specify the payment of attorney's fees. Instead, attorney's fees are included in the $785.30 amount listed on the HUD-1 statement

"wire-in" money, because it was the only amount that the lender actually paid to Vantage Point Title in this case.

Respondent acknowledged that he did not verify that any checks involved in this closing cleared the bank. Indeed, two checks which caused insufficient funds in Vantage Point Title's trust account[5] involved with the Francis closing spurred the ODC investigation into Respondent's participation in the closing.[6]

An investigative panel authorized formal charges against Respondent following an investigation by ODC in connection with the Francis closing. ODC filed formal charges against Respondent on October 31, 2013, alleging that Respondent failed to supervise the disbursement of funds in the Francises' residential real estate transaction and failed to maintain proper records of Vantage Point Title's account—into which Respondent's clients' closing funds were deposited. Respondent filed an Answer, denying the charges against him.

### *Panel Hearing and Report and Recommendation*

A hearing convened before the Panel on August 26, 2014. Respondent appeared pro se and testified at the hearing, along with Mrs. Francis and Diane Temple, the owner of Carolina Attorney Network. In his closing comments to the Panel, Respondent admitted that he may have been "negligent" in reviewing the disbursement log, but that he did not fail to conform to his duties as set forth in the RPC. Finally, Respondent contended that despite his admitted mistake, he was not required to maintain his own trust account for the funds in residential real estate

---

for "title services and lender's title insurance." Therefore, the HUD-1 statement neither indicates that $250.00 of that amount was for attorney's fees, nor that Carolina Attorney Network received a payment.

[5] Although Vantage Point Title maintains a national trust account for all fifty states, at some point, Vantage Point Title—for an unknown reason—opened a South Carolina Interest on Lawyers Trust Accounts (IOLTA) account. Vantage Point Title then wrote two checks from this South Carolina IOLTA account in connection with the Francis closing.

[6] Ultimately, all checks cleared, however, and the Francises sustained no harm as a result of the overdrafted account.

transactions to pass through,[7] and thus, was not required to maintain records under Rule 417, SCACR.

ODC contended that under the case controlling Respondent's misconduct, *Doe v. Richardson*, 371 S.C. 14, 636 S.E.2d 866 (2006),[8] Respondent's act of simply reviewing the disbursement log was not sufficient to fulfill his responsibility to ensure that the funds were properly deposited and disbursed. While ODC agreed with Respondent's assertion that he was not required to maintain his own trust account, ODC stated that attorneys must maintain certain records regardless of the existence of a trust account. Further, ODC discussed Respondent's failure to explain the scope of his representation to the Francises, and argued that the evidence supported a finding that Respondent improperly shared a fee with a non-lawyer based on the way the funds were disbursed through Carolina Attorney Network.

Subsequently, the Panel issued a Report and Recommendation (the Panel Report). The Panel found that the evidence presented at the hearing raised four instances of misconduct in connection with Respondent's handling of the Francis closing: (1) Respondent failed to ensure that his clients' loan proceeds were properly disbursed; (2) Respondent failed to disclose to his clients the actual disbursement of their loan proceeds, including his sharing of legal fees with non-lawyer third parties; (3) Respondent failed to ensure that the representations in the HUD-1 statement matched the actual disbursements of loan proceeds; and (4) Respondent did not maintain accurate financial records related to the Francis closing.

The Panel found clear and convincing evidence that Respondent engaged in professional misconduct in violation of Rules 1.5(b) (Disclosure of the Scope of Representation and Fees), 5.3 (Responsibilities Regarding Non-lawyer Assistants),

---

[7] *See Doe v. Richardson*, 371 S.C. 14, 18, 636 S.E.2d 366, 868 (2006) (providing that the Court does not require the funds disbursed in a residential real estate closing to pass through the supervising attorney's trust account).

[8] In that case, this Court held that disbursement of loan proceeds for a residential real estate refinancing is an integral step in the closing of such a transaction, constitutes the practice of law, and thus, disbursement must be conducted under the supervision of an attorney. *See* 371 S.C. at 18, 636 S.E.2d at 868. The Court stated that it chose not to specify the form that supervision must take, and did not require that the funds pass through the supervising attorney's trust account. *Id.*

and 5.4 (Professional Independence of a Lawyer, which prohibits sharing fees with non-lawyers) RPC, Rule 407, SCACR; that Respondent was not in compliance with the recordkeeping requirements of Rule 417, SCACR; and that Respondent failed to ensure that the representations in the HUD-1 statement—specifically, the attorney's fees—actually matched the disbursement of loan proceeds.

The Panel noted that Respondent presented no evidence in mitigation. In aggravation, the Panel considered Respondent's prior disciplinary history, which included a thirty day suspension in 2008 for failure to maintain his trust account and safeguard client property, which resulted in several reports of insufficient fund items.

The Panel recommended a public reprimand. It further recommended that the Court order Respondent to pay the costs of the proceedings and be required to complete the LEAPP Ethics School and Trust Account School.

## STANDARD OF REVIEW

The sole authority to discipline attorneys and decide appropriate sanctions after a thorough review of the record rests with this Court. *In re Thompson*, 343 S.C. 1, 10–11, 539 S.E.2d 396, 401 (2000) (per curiam). In such matters, this Court may draw its own conclusions and make its own findings of fact. *Id.*; Rule 27(e)(2), RLDE, Rule 413, SCACR (We "may accept, reject or modify in whole or in part the findings, conclusions and recommendations of the [Panel]."). Nevertheless, the findings and conclusions of the Panel are entitled much respect and consideration. *Thompson*, 343 S.C. at 11, 53 S.E.2d at 401. Moreover, "[a] disciplinary violation must be proven by clear and convincing evidence." *In re Greene*, 371 S.C. 207, 216, 638 S.E.2d 677, 682 (2006) (per curiam); *see also* Rule 8, RLDE, Rule 413, SCACR ("Charges of misconduct or incapacity shall be established by clear and convincing evidence, and the burden of proof of the charges shall be on the disciplinary counsel.").

## LAW/ANALYSIS

Respondent takes exception to four specific factual findings in the Panel Report, as well as the Panel's finding of misconduct regarding Respondent's alleged failure to disclose to the Francises the limited scope of his representation or the actual disbursement of their loan proceeds. ODC takes no exceptions to the Panel Report and its recommendation.

### A. *Exceptions to Factual Findings*

### 1. Mortgage Satisfaction

In its Findings of Fact section, the Panel Report states that after Respondent receives the disbursement log, "Respondent or an employee of Carolina Attorney Network then verifies that the new mortgage is properly filed by reviewing the online records of the county's Register of Deeds office. Based on this, Respondent assumes that the existing mortgage has been satisfied."

Respondent takes exception to the last sentence of this statement, arguing that Respondent did, in fact, review the county website to ensure that the mortgage satisfaction occurred. However, as ODC points out, the Panel did not find that Respondent failed to ensure that the Francises' mortgage had been satisfied, and that fact did not affect any of the Panel's findings of misconduct. Moreover, this finding of fact is based on Respondent's testimony at the Panel Hearing that he or someone from Carolina Attorney Network reviewed the online records to determine that the Francises' mortgage had been satisfied, in conformance with his routine procedure for closings.

Therefore, we find this exception is meritless.

### 2. Respondent's Presence at the Francis Closing

Respondent takes exception to a footnote in the Panel Report which states:

Evidence emerged at the hearing that suggested that Respondent was not present at the closing and that he did not review or explain the closing documents to Mrs. Francis. Disciplinary Counsel did not allege misconduct in this regard in the formal charges. Because there was conflicting testimony as to these issues, the Hearing Panel does not find clear and convincing evidence to support a finding of misconduct in this regard.

Based on his exception, Respondent seems to argue that misconduct is alleged with regard to his presence at the Francis closing. However, as the footnote states, the Panel did not make any finding on this issue, and there is no indication that the Panel gave any consideration to the evidence mentioned in the footnote.

### 3. Settlement Statement

Next, Respondent takes exception to a finding of fact in the Panel Report, which states that the "[s]ettlement statement does not specify the payment of attorney's fees." Respondent asserts that the document attached to the settlement statement, entitled "Itemization of Fees"— which would have been signed by the Francises—"breaks down" the settlement charges.

We find that both the Panel Report and Respondent are correct: the settlement statement does not specify to whom the $250 attorney's fee will be paid or that it would be split between Respondent and Carolina Attorney Network; and the "Itemization of Fees" form does indeed list the $250 attorney's fee. Nevertheless, even if the "Itemization of Fees" form had been signed by the Francises,[9] the form still does not specify the splitting of the $250 attorney's fee. Therefore, the "Itemization of Fees" form does not impact the Panel's finding that Respondent failed to properly disclose to the Francises—and obtain approval of— the distribution of the attorney's fee or Carolina Attorney Network's involvement in the closing.

### 4. South Carolina IOLTA Account

Respondent's fourth exception relates to a footnote in the Panel Report which states:

> In a submission to ODC following his written response to·the Notice of Investigation, Respondent stated that it was Vantage Point Title's "[failure] to deposit funds into the correct trust account" that caused the overdraft. Respondent repeated this theory at the hearing. According to the financial records produced by Respondent, this is not true. The wire confirmation clearly shows that the funds were received into the South Carolina account . . . on July 2, 2012. The disbursement checks, issued on June 28, 2012, were written on that same account. Review of the June 2012 bank statement for the All States Escrow account . . . reveals· no deposit of $801.30 from the date of closing (June 19) through the date of disbursement (June 28). The funds were clearly deposited into the same account from which

---

[9] The copy of the form in the record does not include the Francises' signatures.

the checks were written. The cause of the overdraft was disbursement before deposit, not deposit into the wrong account.

Respondent argues that he "was unaware of the overdraft because there was never supposed to be a [South Carolina] IOLTA account opened." Respondent further states that the "account was never supposed to be opened and there never would have been an investigation without this account having been opened."

In response, ODC asserts that the manner in which allegations of misconduct come to their attention is not relevant to whether misconduct occurred or whether an attorney should be sanctioned. We agree. At this point, it is of no consequence whether or not the South Carolina IOLTA account should have been opened, because the existence of the account does not affect Respondent's duty to supervise the disbursement of funds. Therefore, this exception is also meritless.

## B. Exception to Finding of Misconduct

Respondent takes exception to the Panel's second finding of misconduct, in which the Panel found "clear and convincing evidence that Respondent failed to disclose to Mr. and Mrs. Francis the limited scope of his representation or the actual disbursement of their loan proceeds in violation of Rule 1.5(B), RPC, Rule 407, SCACR." Specifically, Respondent challenges the finding of misconduct with regard to the failure to disclose, arguing that "it is virtually impossible to tell what Respondent disclosed because both the Respondent and client . . . do not recall the closing." Respondent contends that there is no evidence in the record regarding Respondent's conversations with the Francises at their closing, and "there is no way to justify" the Panel's finding on this issue.

Rule 1.5(b) of the RPC requires lawyers to communicate to their clients the scope of their representation, as well as the basis or rate of their fee. Rule 1.5(b), RPC, Rule 407, SCACR. We find that the Panel was correct in concluding that under this rule, "a lawyer who supervises [a residential real estate closing] process must, at a minimum, explain [the disbursement] process to the clients and ensure that they understand the lawyer's limited role in the transaction does not include receipt and disbursement of funds."

The only evidence in the record supporting Respondent's position is the dual representation disclosure, which Respondent testified that he presented to the

Francises at their closing.[10]  That form states that the clients "have engaged [Respondent] in connection with Carolina Attorney Network, to perform certain services regarding your real estate transaction and to oversee your transaction to ensure that it is properly performed in accordance with the laws of the State of South Carolina."  The form further provides the notice of dual representation, stating that the attorney "represents both you and the lender."

However, even assuming the Francises signed this form, the form does not specify what the term "certain services" includes, nor does it go on to explain how Respondent would "oversee" the transaction.  At the hearing before the Panel, Respondent first admitted that he did not inform the Francises that his legal services did not include obtaining the title opinion or exactly who was going to be handling the disbursement.  Respondent then went on to testify that at closings, he routinely stated that the title company was going to be "handling the money" involved with the closing.

Nevertheless, the dispositive fact is that Respondent did not know the details of the disbursement in the Francises' transaction.  Indeed, Respondent testified that he was unaware at the time of the closing that the transaction would be net funded. Therefore, Respondent could not have properly explained the transaction—or his role in it—because he was unaware of the details.  Accordingly, we find there was clear and convincing evidence in the record to support the Panel's finding that Respondent failed to properly disclose the limited scope of his representation of the Francises.

### C.  Undisputed Findings of Misconduct

The failure of a party to file a brief taking exceptions to the report constitutes acceptance of the findings of fact, conclusions of law, and recommendations.  Rule 27(a), RLDE; *see In re Jardine*, 410 S.C. 369, 375, 764 S.E.2d 924, 927 (2014) (per curiam).  Neither party disputes the Panel's remaining findings of misconduct, which conclude that Respondent committed misconduct by violating Rules 5.3 and 5.4, RPC, Rule 407, SCACR, and Rule 417, SCACR, and

---

[10] Respondent did not provide a signed copy of the dual representation disclosure form in the record, but testified that he presented the form to the Francises for their signatures at the closing.

that under South Carolina law, Respondent failed to properly supervise the disbursement of funds—which constitutes the practice of law—by failing to ensure that the settlement documents properly described the disbursement of funds.

The Panel Report provides an excellent analysis of Respondent's violations of each of these rules. This case presents a situation where Respondent conducted his duty to supervise the disbursement of residential real estate proceeds in name only. In other words, Respondent "rented" his name and status as an attorney to attempt to satisfy the attorney supervision requirement. A finding that Respondent did not commit misconduct despite his very minimal role in the Francis closing would essentially eliminate the meaning and the purpose behind the requirement that an attorney supervise the disbursement of funds in a residential real estate transaction and recordkeeping requirement of Rule 417, SCACR. *See Richardson*, 371 S.C. at 18, 636 S.E.2d at 868. We provide guidance to the bar, *infra*, as to how attorneys may satisfy their duty to oversee the disbursements of funds in a real estate transaction; in this case, there is no question that Respondent's cursory review of the disbursement log did not satisfy his duty to oversee the disbursement of the Francises' funds.

Therefore, we find that in addition to violating Rule 1.5(b), as discussed, *supra*, Respondent also violated Rules 5.3 and 5.4, RPC, Rule 407, SCACR, and Rule 417, SCACR, and that Respondent is subject to discipline pursuant to Rule 7(a)(1), RLDE, Rule 413, SCACR.

### D. Duty to Supervise Disbursement of Funds

In furtherance of our concern that attorneys are being used as "rubber stamps" to satisfy the attorney supervision requirement in low cost real estate closings, we take this opportunity to expand upon *Richardson*, in which we held that the disbursement of funds in the context of a residential real estate transaction must be supervised by an attorney. *See* 371 S.C. at 18, 636 S.E.2d at 868; *see also State v. Buyers Serv. Co.*, 292 S.C. 426, 434, 357 S.E.2d 15, 19 (1987) (providing that real estate closings should be conducted only under the supervision of attorneys). While we declined, in *Richardson*, to specify the form that such supervision must take, we held that an attorney's obligation to supervise the disbursement of funds includes "overseeing" that step of the closing process. 371 S.C. at 18, 636 S.E.2d at 868.

We now clarify that an attorney's duty to oversee the disbursement of loan proceeds in a residential real estate transaction is nondelegable. To fulfill his or her duty, the attorney must ensure: (a) that he has control over the disbursement of loan proceeds; or (b) at a minimum, that he receives detailed verification that the disbursement was correct. In practice, an attorney may find that utilizing his own trust account and disbursing the funds himself provides the most effective means of fulfilling this duty. We stand by our decision in *Richardson*, however, and do not require that the funds must pass through the supervising attorney's trust account. *See id.* Therefore, we also find an attorney's verification of proper disbursement, via sufficient documentation or information received from the appropriate banking institution—in addition to the disbursement log itself—to be acceptable in fulfilling his duty to oversee the disbursement of funds.[11]

In essence, Respondent was used as a rubber stamp[12] for a non-lawyer, out-of-state organization with no office in South Carolina, whose involvement was not disclosed to Respondent's clients. This Court has insisted on lawyer-directed real estate closings in order to protect the public. Respondent's method of handling his client's business provided no real protection to his clients and no attorney record of the transaction by which to verify the details of the closing if problems developed after closing.

---

[11] In his dissent, Chief Justice Pleicones contends that Respondent's misconduct is limited to a single closing during which he argues Respondent's only violation was his failure to explain the nature of a "net funding transaction" to mortgage refinance clients. As has been discussed above, the Panel findings detail at least five violations of the RPC, including the (1) failure to insure proper disbursal of client funds; (2) failure to disclose to clients the actual disbursements made with their loan proceeds; (3) failure to insure that the HUD I listing of disbursements matched the actual disbursements; (4) failure to maintain factual records on the Francis closing; and (5) sharing of attorneys' fees with non-lawyers. These are not simply "technical violations" confined to one transaction.

[12] Respondent admitted that he followed this same way of doing business in thousands of closings.

## CONCLUSION

Based on the foregoing, we find that Respondent has committed misconduct. Respondent does not take exception to the Panel's recommended sanctions, which included a public reprimand. Because we view Respondent's misconduct in failing to supervise the disbursement of funds in the Francis closing as a gross abandonment of his supervisory authority, we issue a public reprimand.

We also agree with the Panel's remaining recommended sanctions. Within thirty days of the date of this opinion, Respondent shall pay the costs incurred by ODC and the Panel in the investigation and prosecution of this matter. We further require Respondent to attend the LEAPP Ethics School and Trust Account School within six months of the date of this opinion.

**PUBLIC REPRIMAND.**

**KITTREDGE, J., and Acting Justice James E. Moore, concur. PLEICONES, C.J., dissenting in a separate opinion in which HEARN, J., concurs.**

**CHIEF JUSTICE PLEICONES:**  I respectfully dissent.  Through an error on the part of a title insurance company, the Office of Disciplinary Counsel became aware of a single closing wherein Respondent failed to explain the nature of a "net funding transaction" -- to clients who admittedly sought and obtained a home mortgage refinance from their mortgage company, and who suffered no prejudice.  In my opinion, these facts do not warrant a public reprimand.  Moreover, nothing in this single instance justifies the modification of our holding in *Richardson*[13] - declining to "specify the form [that attorney supervision of loan disbursements] must take . . . ." - in favor of adopting a non-delegable duty to oversee loan disbursements through "detailed verification" or through the receipt of "sufficient documentation or information" in addition to the disbursement log itself.  The majority neither explains what this means nor how more oversight could have prevented the title company from issuing checks drawn on the wrong account.

For the reasons given above, I respectfully dissent and would not impose a sanction for Respondent's conduct in this matter.[14]

**HEARN, J., concurs.**

---

[13] *Doe Law Firm v. Richardson*, 371 S.C. 14, 636 S.E.2d 866 (2006).

[14] The majority misunderstands the thrust of my objections to its decision.  Respondent's misconduct arose from a single real estate transaction in which the clients, who did not file a complaint, suffered no prejudice.  The majority's sanction is justified in part by statements such as "Respondent "rented" his name and status" and that he acted "simply [as] a rubber stamp," and in part by discounting Respondent's testimony regarding his usual practices apparently because the conversation at the Francis closing is not supported by "factual records."  *Compare*, *e.g.*, *Frasier v. State*, 351 S.C. 385, 570 S.E.2d 172 (2002) (testimony of counsel's usual practice sufficient to find it was done in this case).  Further, the majority imposes new, vague requirements on residential real estate closings despite the fact that the current practice is not implicated by the facts of the Francis closing.